# FILLMORE *et al. v.* RIETHMANN, (error.)
## AND
# RIETHMANN *v.* FILLMORE *et al.,* (appeal.)

*(Supreme Court of Colorado, December Term, 1881—Error to and appeal from the District Court of Arapahoe County.)*

1. DESCENDABLE REALTY—POSSESSION OF LOTS IN TOWN SITE.    One in possession of lots which form a part of an original town site, at the date of the grant, being the rightful occupant and *bona fide* owner of the improvements thereon, is entitled, as such, as beneficiary under the act of Congress of May 28, 1864, and, under the statutes of the Territory of Colorado in 1865, such possessory right had the status of real estate, and as such descended to the heir.

2. SAME—PATENT—CONVEYANCE—TRUST.    Patent having issued to such town site, a conveyance by the Probate Judge to another than the heir is unauthorized by the act of Congress of May 28, 1864, and in violation of the trusts which it declared and imposed.    While the legal title will pass by such conveyance to the grantee, his holding will be in trust for the heirs—any subsequent purchaser from such grantee will hold upon the same trusts—unless as a *bona fide* purchaser without notice he took the title discharged of the trusts.

3. SAME—NOTICE.    A purchaser having knowledge that the ancestor was the owner and in possession of the improvements on such lots at the time of the grant of the town site, and that the deed was made by the Probate Judge to another than the heir, " to save the expense of going through the Probate Court," in order to make sale of the property, is chargeable with notice.    Reliance upon mistaken legal advice, after full inquiry and knowledge of the facts, will not protect such purchaser as against the heirs.

4. SALE OF INFANTS' REALTY.    The power to sell the inheritance of infant heirs is purely statutory, and no sale thereof can be made that will bind the infants, except by compliance with the statutory provisions. statute.

5. RENTS AND PROFITS—IMPROVEMENTS, ETC., THEREON.    The purchaser of real estate to which infants are entitled, must account to such infants for the rents and profits thereof for the time the same has been held by him—less any reasonable sum paid by him for improvements, insurance, taxes, etc.

6. SAME—INTEREST.    Rents are compensation for the use of real estate, as interest is compensation for the use of money.    Interest on rents and profits is in the nature of compound interest, and may be imposed in the exercise of a sound discretion; but only when the possession was *mala fide.*    Judgment for restitution with rents and profits is equivalent to a decree for repayment of a trust fund with simple interest, and meets the full equities of the case, when the purchase and possession were in good faith.

ELBERT, C J.    The original bill, which was exhibited in the District Court on the 7th day of September, A. D. 1875, sets

forth the settlement of Denver in the year 1858; the subdivision of the lands into lots, blocks, etc.; that John S. Fillmore, plaintiffs' ancestor, settled upon the southerly 82½ feet of lots 17 and 18, block 46, the premises in controversy, and was long before, and at the time of his death, the *bona fide* owner of certain buildings situate thereon; the act of Congress of May 28, 1864; the death of said Fillmore December 25, 1864, leaving plaintiffs, Elizabeth M. Kershow, John Norman and John Septer Fillmore as his heirs; that his estate in the premises in controversy descended to them; that Steck, Rogers and Clark were appointed administrators of the goods and chattels pertaining to his estate; that on the 6th of May, 1865, James Hall, Probate Judge, entered the town site; that at the death of their ancestor, the plaintiffs, John Norman and John Septer, were each under two years of age; that about June 29, 1865, Steck filed with the Probate Judge his claim for the premises in controversy, with other lots, and demanded a conveyance, under the act of May, 1864; but endorsed thereon, on the same day, and filed in the office of said Probate Judge, upon and together with the said statement, was a declaration in writing under the hand of said Steck, subscribed by him on the same day and year with said statement, in words and figures as follows: "This filing is made by the undersigned in trust for the lawful creditors and heirs of the late John S. Fillmore, but the title to be taken by the undersigned absolutely, is wholly in trust as aforesaid;" that said Hall, about August 11, 1865, conveyed the premises to Steck; that Steck held the legal estate in trust, to be conveyed to the plaintiffs on request; that about September 12, 1866, for the consideration of $17,000, he conveyed the premises to Riethmann, and about the same time defendant Riethmann entered into possession, claiming under said conveyance; and has ever since been in possession of, and receiving the rents; that the conveyance to said Riethmann was without authority of law, and *in* violation of the duty of said Steck.

That no petition was filed by the administrators or either of them in the Probate Court touching said sale, and no account was had of the debts due and payable by the intestate, or of the value of the goods and chattels, or of the proceeds of the sale, nor was there any order or decree of said Probate Court, or other judicial sanction of such sale or conveyance.

That Riethmann has been a resident of Denver ever since 1860, and at the time of said conveyance, well knew that said decedent was, in his lifetime, and at the time of his death, the rightful occupant of the premises, and the *bona fide* owner of the improvements, buildings, etc., situate thereon, and had possession thereof by his tenants, etc., before and at the time of his death, and had departed this life leaving plaintiffs as his heirs at law.

Prayer that Riethmann be declared to hold the premises, as trustee for Elizabeth M., as to one-half part, and as trustee for said John Norman and John Septer Fillmore, as to the remaining part, and required to convey the same, etc.; that an account be taken of the rents received by him, and he be required to pay Elizabeth M. one half thereof, and the remainder to the other plaintiffs, and that all persons in possession, claiming through or under said Riethmann, or any of the defendants, be required to surrender up possession—for a receiver—injunction to restrain collection of rents by Riethmann, from making any further lease, or any conveyance of the premises, etc.

At the September term, 1878, a supplemental bill was filed by Jere Kershow and Charles B. Patterson—Patterson suing as administrator of Elizabeth M. Kershow—which sets up as supplemental matter, that Elizabeth M. Kershow departed this life since the filing of the original bill; and before her demise conveyed her interest in the premises to said Kershow, and that all the rents which had accrued before, belonged to said Patterson as her administrator.

The answer of Riethmann denies that John S. Fillmore, deceased, was in his lifetime possessed of the premises in controversy, or the owner of any improvements thereon; denies that the same descended to plaintiffs, or that Steck held the same in trust for plaintiffs; denies that Steck's conveyance was in violation of his duty. The other allegations of the bill, and supplemental bill, are, as we claim, admitted; but the answer sets up that, at the time of the conveyance of the premises by Steck to defendant, defendant had never heard, nor been informed, that, at the time of the filing of his statement with the Probate Judge, said Steck made any declaration in writing, to the effect that the same was a trust; denies notice of any secret equity; avers that he paid in cash for said premises the full sum of $17,000; denies

51

that the same was an inadequate price; avers it was a reasonable price, and was received by said Rogers, and accounted for to the estate of said John S. Fillmore, deceased.

Avers that no person, save Amos Steck, filed any statement in writing with the Probate Judge, containing a description of said premises; that the claim of plaintiffs is barred by the rules and regulations adopted by the Legislative Assembly of the Territory of Colorado; and sets up the statute of limitations.

The District Court, at the final hearing, dismissed the bill as to Kershow, and as to Patterson, in his capacity of administrator; decreed an account, as to the rents and other matters, and upon the report of this account, directed a conveyance of the undivided one-half of the premises by Riethmann to the infant plaintiffs, and the payment of a balance, found due them, for rents.

Both the parties, plaintiffs and defendants, being dissatisfied with the decree of the Court below, the plaintiffs, John Septer Fillmore *et al.*, prosecute their writ of error, and the defendant, Riethmann, appeals.

The errors assigned, both upon the writ and the appeal, go to the same record and decree, and may properly be disposed of in the same opinion.

The questions made by the appellant, Riethmann, are in their nature fundamental, and if they are to be resolved in his favor, dispose of both cases.

The assignments on the appeal will, therefore, be first considered.

It is claimed that John S. Fillmore, the ancestor of the plaintiffs, John Septer and John Norman Fillmore, was not possessed of a descendable estate in the lots in controversy.

The lots formed a part of the original town site of Denver, or what is more generally called the "Congressional grant." Fillmore was the "rightful occupant and the *bona fide* owner of the improvements thereon," and as such entitled as a beneficiary under the act of Congress, May 28, 1864.

We had occasion in the case of *Gillett et al.* v. *Gaffney et al.*, 3 Colo., 351, to consider this question, and, after a careful reconsideration of the entire argument then urged and now repeated, we see no reason for change or modification of the views therein expressed.

We there held that, under the legislation of the Territorial Assembly, such a possessory right had the status of real estate, and as such descended to the heirs, and until it can be shown that the legal status and descendibility of such a title were not rightful subjects of legislation, we think the doctrine of the case impregnable.

Upon the death of Fillmore, his possessory right in and to the premises, and the right this possession gave him to receive title from the Government, descended, one-half part to his widow, and one-half part to his infant sons.

The conveyance of the premises to Steck by the Probate Judge was not only unauthorized by the act of Congress of May 28, 1864, but in violation of the trusts which it declared and imposed. While the legal estate passed, Steck held in trust for the heirs. *Coy* v. *Coy*, 15 Minn., 126.

The appellant Riethmann, by the conveyance of Steck having succeeded to the title, held upon the same trusts, unless, as a *bona fide* purchaser without notice, he took the title discharged of the trusts. *Coy* v. *Coy, supra; Clayton* v. *Spencer*, 2 Colo., 378; *Smith* v. *Pike*, 3 Colo., 187.

This brings us to a consideration of the second and chief proposition of counsel for the appellant, namely, that Riethmann was a *bona fide purchaser* without notice.

The effect of the fact, if established, to give Riethmann the title discharged of the trust as against the infant plaintiffs, we need not decide; nor need we go into the question, made on the pleadings, that the answer does not deny notice; nor into the question of implied notice, as, in our opinion, the evidence of actual notice of the trust is entirely sufficient.

The appellant Riethmann himself, without any attempt to evade or equivocate, testifies:

"I am one of the defendants; have resided in Denver since 1858. I am acquainted with the premises in controversy, and now claim to be the owner thereof. It was conveyed to me about September 12, 1866, by Amos Steck. About January, 1866, I made the arrangement with Henry J. Rogers to pay $17,000; half cash, and half in thirty, sixty and ninety days. He told me that as soon as Steck got back he would make the deed; *said that the property was all in Amos Steck's name by an agreement they had made to save expense going through the Probate Court*

*every time they sold some property.*   I paid the amount according to agreement to Henry Rogers.   *He told me* they wanted the money to pay the Government, because *the Fillmore estate was indebted to the Government.   When Steck came, I went to him for a deed;* he stated the same as Mr. Rogers, that they had made the arrangement so as to save expense to the estate, that the title was in him, and that there would never be any question about it. On reflection, I am certain that Rogers only told me that the title was in Steck, and that they would give me a deed.   *The conversation in reference to the Probate Court and the estate was had at the time I received the deed from Steck.*   The value of the property at the time of my purchase was represented to be less than I paid.

"Cross-examination: Don't recollect how I happened to go to Rogers to negotiate for this property, except I knew it was for sale.   *I knew at the time of my purchase from Rogers that John S. Fillmore had been in possession of this property at and before the time of his death.   I knew that it belonged to the Fillmore property.*   I knew he was dead.   Don't recollect that I knew at that time that he had any children; did not know that said Steck held the title as part of the estate of John S. Fillmore, deceased; did not know how he held it.   I do not know whether I supposed that he held it as his own property or not.   I mean to say that I paid $17,000 for the property without knowing how it was held. Rogers told me Steck would make me a good deed.   *I knew that Amos Steck and Rogers were the administrators of said John S. Fillmore, deceased.*   I made no effort to find out by what right said Rogers assumed to sell the property; he was in the First National Bank, and a big man, and I thought he was good.

"Q.   Did you suppose that, as administrator of the estate, Rogers had power to sell these premises?   If not, what authority did you understand him to possess?

"A.   *Only what he told me, that he was acting as agent or administrator, I don't know which, to pay the debts—to pay the debts of the Fillmore estate.   He reported that he was the agent and had the right to sell; that he was the agent of the Fillmore estate, and I bought on the faith of such representations, and my confidence in Rogers.*   As I said before, I think I had a bond for a deed, which I accepted because I thought it was good.   *I had no knowledge as to Rogers' authority except his statement that he was the admin-*

istrator or agent of the Fillmore estate. I understood it that way, or I would not have bought. I do not know what became of the money I paid Rogers, or what it was used for. *Rogers told me at the time I bought that the estate was in debt to the Government, and that was what the property was sold for.* I made no effort to see to it that the money was applied to that purpose. I took possession of the property on the first of March, 1866, I think, and have received the rents of the property ever since. In round numbers they amount, I think, to $50,000; that is my estimate. I have not at all times kept an account.

Henry J. Rogers testifies:

"Knows the parties, except Charles B. Patterson Was residing in Denver, Colorado, on the 12th day of September, 1866. Knew the premises in controversy. Negotiated the sale of them to the defendant, Riethmann. A certain amount was paid down at the time of the sale. The amount for which the sale was made was $17,500. *Before the payments were all made Riethmann had some anxiety as to the title, having been told that the title was not satisfactory.* He spoke to me about it. I referred him to Bright Smith. He paid the balance as agreed. *It was well known in Denver how this property was held at the time of the sale. I was administrator with Steck of the estate of Major Fillmore, deceased.* I considered at the time that $17,500 was all the property was worth. Steck never saw a dollar of the money. The money was used by me in the business affairs of said estate, and was accepted by the estate and distributed among the creditors.

Steck testifies: * * * * * * * *

"I don't remember that I had any conversation with the defendant with reference to the title prior to the time of executing the deed. *It would seem to me I must have had some conversation, because I don't think I would have made the deed without knowing that the money was paid.* I had conversation with him afterwards about the title; told him the title was all right. I was one of the administrators of the estate of John S. Fillmore, at that time. * * * * * I think the tenements now standing on the premises in question were there, and occupied the whole of the premises at the time of Fillmore's death, and for several years before that. *I think Fillmore was occupying these tenements by his tenants at the time of his death.*

&ast;    &ast;    &ast;    &ast;    I never claimed a foot of this property as absolute owner, except so far as to the record of it.    In fact, I did not claim to own a foot of it.    I don't know whether my possession and that of Henry J. Rogers as administrators of the estate of John S. Fillmore was notorious in the City of Denver during our continuance in that position    *I suppose it was pretty well known.*    Rogers had no authority over this property except as my co-administrator; but as a matter of fact he exercised a good deal of authority over it."

It is impossible to read this testimony and not be satisfied that Riethmann was fully advised that the property for which he was negotiating belonged to the estate of John S. Fillmore, deceased; that Rogers and Steck were but acting as administrators of that estate; that the proceeds of the sale were to go towards the payment of the debts of the estate; and while Steck had taken the title from the Probate Judge in his own name, it was explained to him that it was an arrangement "to save the expense of going through the Probate Court every time they sold property."    That Riethmann had no actual knowledge of the declaration of trust endorsed by Steck on the declaratory statement filed with the Probate Judge, if it be a fact, is indifferent, as, independently of this, Steck was but a trustee, and Riethmann had full knowledge of the facts that made him such.

"A purchaser is chargeable with notice, not only when the evidence raises a presumption that he knew, but when there is just ground for inferring that reasonable diligence would have led him to a discovery of the truth."    2 L. Cas. Eq., 153.

"If one have knowledge of distinct facts affecting the title to lands which he is about to purchase, he is not at liberty to close his eyes, and then screen himself under the plea of ignorance of other facts, connected with the facts already known to him; but he is bound, in good faith, to make reasonable inquiry, and will be affected with notice of all that he might have learned from such inquiry."    *Id.* 154.

"Collateral circumstances sufficient to put one on inquiry will, in general, be regarded as good notice of the ultimate fact to be established."    Wade Notice, Sec. 10.

"What is sufficient to put a purchaser on inquiry is good notice, that is, when a man has sufficient information to lead him to a fact, he shall be deemed conusant of it."    2 Sudg. Vend., 542.

"The Court will impute fraud or gross and willful negligence to a person dealing with respect to an estate, if he omits all inquiries as to the deeds, and will hold him to have notice of those circumstances, which, had he not neglected his duty, would have come to his knowledge." 2 L. Cas. Eq., 123.

Take the strict rule as laid down by Judge Dillon, and it cannot aid the appellant:

"To effect or charge Besner, notice of the plaintiff's rights must be clearly brought home to him—*vague rumors* and indeterminate suspicions will not answer. Nor will general assertions made by strangers to the title be sufficient. The facts must be such as to *bind* the *conscience* of the party, to *alarm him*, and put him upon such inquiry as, if pursued, would lead him to a knowledge of those rights with which it is proposed to effect him, that the notice, or what in law will amount to notice, should be *clear* and *decided.*" *Wilson* v. *Miller et al.*, 16 Iowa, 115.

The case at bar is not one of want of inquiry or want of information, but of reliance upon mistaken legal advice, after full inquiry and full knowledge of the facts.

The fact that the title was taken in the name of Steck to avoid the expense of going through the Courts, and that the sale was made in fact, though not in form, by him as administrator for the purpose of liquidating the debts of the estate, cannot avail, either in law or equity, to give validity to the transaction, as against the infant children.

The power to sell the inheritance of infant heirs is purely statutory.

The District Court, by the act of 1861, and the Probate Court, by the amendment of 1862, (Acts 1862, p. 97,) were authorized and required, in case of the insufficiency of the personal estate, to pay the debts after due inquiry, to direct a sale of the realty, or so much thereof as might be necessary. The Court could not direct a sale of the whole of the real estate, when a part would be sufficient to discharge the debts. Acts 1861, p. 428, Secs. 94, 95.

Except in the case prescribed by this statute, there was no authority to sell the real estate of the intestate to pay debts, nor could a sale be made that would bind the infant heirs except by compliance with its provisions.

Administrators cannot dispose of the real estate of the intestate except as such power is conferred upon them by the Court. The reason is obvious, in the fact that the lands of the intestate descend to the heirs, and not to the administrator. It is the order of the Court which confers the power, and it is the statute alone which authorizes the Court to make the order. Bing. Real Estate, 200; Freeman Void Judicial Sales, 28.

The administrator cannot by any device or indirection, as was attempted here, substitute his own authority for that lodged by the statute in the Court. Under all such covers the property is still and none the less the inheritance of infant heirs, to alienate which there exists no authority either of layman, of administrator or of Court, independent of statute. *Rogers* v. *Dill*, 6 Hill, 416.

The errors assigned on appeal cannot be allowed, and we turn to the assignments by the plaintiffs in error. In respect to the plaintiff, Mrs. Kershow, it is enough to say her right of action was barred by the statute of limitations. Gen. Laws, Sec. 23, p. 597.

It is objected that in taking the account of rents and profits Riethmann was credited with moneys paid out for repairs, insurance and taxes. The expenditures objected to were necessary for the proper protection and conservation of the property; were such as the plaintiffs themselves would of necessity, or in a prudent management of the property, have incurred had they been in possession. It would have been most inequitable not to have allowed credit for expenditures thus made for the common benefit.

That in taking the account in some instances, in the absence of evidence of the exact amount of an item of expenditure, the amount was estimated approximately, is no sufficient ground for reversal, when the evidence show an expenditure in fact, and the basis of the estimate was fair, and the amount allowed not unreasonable.

I know of no rule of equity which forbids the acceptance of approximate results, when, in the complicity of human affairs, exactitude is not attainable.

A more difficult question is raised by the claim of interest on the rents during the defendant's possession.

As matter of law, interest is recoverable only when there is an express or implied contract to pay it, and in England its re-

covery is limited to such cases. But in this country it is frequently imposed in the case of negligent tortions or fraudulent conduct, but in such case its allowance is entirely a matter of discretion. Sedg. Dam., 374.

In the case at bar the question of interest presents itself entirely disconnected from any question of contract when it is allowed as matter of law. If allowed, it must be because it falls within the last named class of cases, and as a matter of discretion.

Cases where Courts of Chancery have imposed interest in an accounting for *moneys* fraudulently used or withheld, are numerous. But the cases involving distinctly the allowance of interest on the rents and profits of lands, independent of contract, express or implied, are neither numerous nor harmonious.

The earlier authorities were emphatic in their refusal of interest in such cases. The doctrine was: "Interest is a compensation for the use of money; rent a compensation for the use of lands; as compound interest (though agreed to by the parties) will never be allowed, so neither will interest be allowed on rent in arrear." *Breckenridge* v. *Brooks*, 2 A. K. Mav., 716; *Payn* v. *Graves*, 5 Leigh, 561; *Roper et al.* v. *Wren*, 6 Leigh, 38; *Beverly* v. *Miller*, 6 Mum., 99.

In *Benzein* v. *Robinet*, 2 Dev. Eq. R., 68, an exception is made where the possession was *mala fide.*

In the later case of *Commonwealth* v. *Recks*, 1 Grat., 440, interest on rents was allowed. So, too, in *Momdy* v. *Ianter*, 3 Grat., 578, where there appears to have been *mala fides.*

*Burnham* v. *Best*, 10 B. Mon., 228, is an authority for the discretionary allowance or disallowance of interest on rents "when due on contracts."

We do not see that it can be controverted that interest on rents and profits is in the nature of compound interest. There is no argument which supports the one that does not equally support the other. If this analogy be correct, then not only the general doctrine of the cases respecting compound interest, but the exceptions to the doctrine should serve as guides in the allowance of or disallowance of interest on rents and profits. Notwithstanding the marked disfavor with which the Courts have always regarded interest upon interest, it has sometimes been allowed

52

when the conduct of the defendant has been grossly delinquent or intentionally contrary to his duty. (Sedg. Dam., 384–385.) And in such a case, independent of any contract, we are of the opinion interest upon rents might well be imposed in the exercise of a sound discretion.

The case at bar comes within the rule, and not within the exception. While the transaction out of which this litigation grew was, as against the infant plaintiffs, a fraud in law, it is entirely free from any suspicion of intentional fraud. The defendant paid a fair and full price to those he supposed authorized to sell and convey, and believed he was getting a good title. He and his advisers mistook the law in a case where the facts were to some extent novel, and the law to some extent unsettled. And while the defendant must be treated as a trustee, he is not to be treated as one who has intentionally and fraudulently abused a trust.

Having required him to reconvey to the infant plaintiffs their undivided one-half interest in the property, and having required him to account to them for their share of the rents and profits of the property during the period of his possession, this is equivalent to a decree for the repayment of a trust fund with simple interest, and meets, we think, the full equities of the case.

In the case upon appeal, as well as the case on error, the decree of the Court below is affirmed.

*Wells, Smith & Macon*, for Fillmore.

*Markham, Patterson & Thomas*, for Riethmann.