### COOPER et al. v. HILL.

(Circuit Court of Appeals, Eighth Circuit.   May 9, 1899.)

#### No. 1,145.

1. LIMITATION OF ACTIONS—ACCRUAL OF CAUSE OF ACTION.
   A cause of action against the directors of a bank for fraudulently diverting its funds for their own benefit accrues as soon as the diversion is complete, in the absence of concealment of the facts on their part; and where such facts are shown upon the records of the bank, and become known to a cashier who succeeds the one involved in the transaction, and who has no interest in the matter adverse to the bank, his knowledge is notice to the bank.

2. NATIONAL BANKS—REPAIRS OF PROPERTY ACQUIRED—PERSONAL LIABILITY OF DIRECTORS.
   A national bank which has lawfully acquired the title to property in payment of a debt has implied authority to make reasonable repairs thereon for the purpose of putting it in salable condition, and its directors cannot be held personally liable for money so expended in good faith.

3. SAME—PROSECUTION OF OUTSIDE BUSINESS.
   A national bank, however, has no power to prosecute a mining business on property which it has acquired,—much less, to expend its funds in prospecting for mineral on such property; and directors who authorize such expenditure are personally liable therefor to the bank or its receiver.

4. SAME—SUIT AGAINST DIRECTORS—JURISDICTION OF EQUITY.
   A suit by the receiver of an insolvent national bank against its officers and directors to compel restitution of funds unlawfully diverted by them is one to execute a trust, and involves an accounting as to trust funds, and hence is of equitable cognizance.

5. SAME—JOINT LIABILITY.
   When a loss has been caused to a national bank by the appropriation of its funds to a purpose unauthorized by law, or by culpable negligence or conversion of its funds, the officers who participated in or consented to the act are jointly and severally liable for the entire amount.

6. SAME—FAILURE TO PROVE ALLEGATION OF FRAUD.
   A bill by the receiver of a national bank against its officers and directors for the unlawful diversion of funds of the bank is sufficient to support a recovery, when the diversion is proved, although a further allegation that such diversion was fraudulent is not proved.   The gravamen of the bill is the fact of unlawful diversion.

7. SAME—INTEREST.
   When the directors and officers of a bank have misappropriated its funds, they are liable for interest on the amount from the date of the misappropriation, as damages; and no statute is necessary to authorize the allowance of such interest by a court of equity.

8. SAME—SUIT AGAINST DIRECTORS—LACHES.
   The directors of a national bank are not trustees of an express trust, with respect to the property or funds of the bank, but of an implied or resulting trust created by the operation of the law upon their official relation to the bank; and the statute of limitations and the doctrine of laches may be invoked in their defense, when sued for a breach of such trust.   Such an action is maintainable either at law or in equity, and a court of equity

will follow the statute of limitations, unless unusual or extraordinary circumstances render its application inequitable in a particular case.

9. SAME.

The officers and directors of a national bank without authority of law used its funds in prospecting and attempting to develop mining property which had been acquired by the bank. Their action was not fraudulent, but was taken in good faith for the benefit of the bank, but resulted in the loss of the funds so diverted. They subsequently sold their interests in the bank, and retired from its management, leaving it solvent and prosperous. Under the new management it subsequently became insolvent, and its receiver brought a suit in equity against the former directors to recover the amount so diverted by them. Such suit was not brought until more than six years after the last of the expenditures in the mining venture had been made, which was the limit of time, under the statutes of the state, within which an action at law for the recovery of the money could be maintained: but subsequently, and within the six years, the defendants, as directors, had repaid to themselves from the funds of the bank certain advances made by them individually in aid of such venture. *Held*, that the court would follow the statute, and as to the amounts originally expended the suit was barred by laches, but was maintainable for the recovery of the amounts subsequently withdrawn without legal authority.

Appeal from the Circuit Court of the United States for the District of Colorado.

This is an appeal from a decree for the payment of the sum of $35,093.45, interest thereon, and costs, by John J. Reithmann, George Tritch, Job A. Cooper, D. C. Dodge, and John Good, to the appellee, Zeph. T. Hill, as receiver of the German National Bank of Denver, on account of the misappropriation of the funds of that bank in 1888 and 1889. All the parties against whom this decree was rendered have appealed to this court except Reithmann, who appears to be content with the result below. The decree rests upon this state of facts: In the years 1888 and 1889 Reithmann, Tritch, Cooper, Dodge, and Good were directors of the bank. Tritch was its president, and Cooper was its cashier. The bank had acquired the ownership of certain mining claims under an execution sale upon a judgment in its favor of about $4,500, and by virtue of certain conveyances which it had procured to be made to Cooper, its cashier, in an endeavor to collect its judgment. The legal title to this property was in Cooper, but he held it for the benefit of the bank. Upon the property was some mining machinery. A shaft had been sunk upon it more than 100 feet, and some drifts had been made from this shaft in an endeavor to discover and mine ore. But the former owners had abandoned the undertaking, the machinery was still, and the shaft and drifts were full of water. In February, 1888, the five directors of this bank against whom the decree below was rendered caused a corporation called the Cassandra Consolidated Mining Company to be organized for the purpose of acquiring, developing, and operating mines. They had the certificates of all the stock of this corporation, except a few qualifying shares which were written to its officers, written to themselves, on July 11, 1888, but they never took them out of the stock book of the company. On July 12, 1888, Cooper made a deed of the mining property which he held for the bank to the Cassandra Company. The latter company procured money from the bank, and used it to pump water out of the mine, to sink the shaft deeper, and to prospect for ore, between February 1, 1888, and April 11, 1889, until it had used, in all, $20.864.82 of the funds of the bank. Upon the books of the bank this money, with the usual interest, was charged as an overdraft against the Cassandra Company. In June, 1888, this overdraft had become $6,800, and each of these five directors deposited $1,200 in the bank to the credit of the Cassandra Company, and thus diminished its apparent overdraft by the sum of $6,000. On October 26, 1889, this mining property had become worthless; and the board of directors on that day passed a resolution to the effect that it should be reconveyed to the bank, that the bank should refund to the five members of the board the $6,000 which they had deposited to the credit of the Cassandra Company, and that the bank should assume that company's over-

draft. Pursuant to this resolution, Cooper, who claimed that his deed to the Cassandra Company had never been delivered, although it appeared upon the records of the county, made a deed of this property to John J. Reithmann, who had then acquired a controlling interest in the bank, for the benefit of the bank; and in December, 1889, the bank paid back to each of the five directors the $1,200 which he had deposited with the bank for the Cassandra Company in June or July, 1888. During all the time when these transactions were going on the bank was solvent and prosperous, and the appellants owned a majority of its stock, and controlled and managed it. The stock was selling in October, 1889, when the resolution to return this mining property to the bank was passed, at the rate of $325 for a share, which was of the par value of $100. About this time the appellants sold their stock in the bank, and the control and management of it was turned over to Reithmann and his friends. On July 6, 1894, the bank became insolvent, and the appellee, Hill, was appointed its receiver. This suit was commenced by this receiver on October 25, 1895. In his bill he alleged the facts we have stated, averred that the moneys of the bank used through the Cassandra Company were misappropriated and lost by the five directors in a futile attempt to develop and explore this mining property, and that this was done by them for their own benefit, and for the purpose of speculation. He alleged that the Cassandra Company was organized and owned by the five directors, that they caused the mining property to be conveyed to it, and that they intended to take the benefit of any advance in its value if paying ore was discovered and meant to charge the bank with any loss they sustained if their speculation was unfortunate. . He alleged that their speculation was disastrous, and in pursuance of their intention they charged the bank with their loss, and escaped without harm. The appellants answered that the mining property was at all times owned by the bank, that the Cassandra Company was organized and operated by them in the interest of the bank, that the purpose of its organization was to form a conduit through which the mining property might be conveyed to a purchaser, and that this was done because they thought that the bank could realize more by a sale of the stock of the Cassandra Company as the owner of the mining property than it could by a direct sale of the property as the property of the bank. They alleged that in 1888 the mine was full of water, so that it could not be examined by a purchaser or sold; that they authorized the expenditure of the money used through the Cassandra Company for the purpose of pumping out the water, clearing out the shaft and drifts, and putting the property in presentable shape for examination, in the hope and belief that in that way they might secure a purchaser of it for the bank. They averred that they advanced the $6,000 which they deposited to the credit of the Cassandra Company in the summer of 1888 to the bank, as an accommodation to it, for the purpose of reducing the apparent overdraft of the Cassandra Company. It appeared at the trial that there were seven directors of this bank; that one Clinton, who prior to that time was the assistant cashier, succeeded Cooper as cashier of the bank in August, 1889, and held that office until September, 1893; that Cooper ceased to be a director of the bank on July 1, 1890; that Tritch ceased to be a member of the directory at the annual meeting in January, 1890; and that Dodge ceased to be a member on January 12, 1892. No complaint of the acts of the appellants was ever made until after the bank became insolvent under the management of their successors, nor until after a receiver was appointed for it in the year 1894. Upon this state of facts a decree was rendered in the court below against the five directors for the entire amount of money expended upon this mining property during the years 1888 and 1889, with interest from December 23d in the latter year.

Charles J. Hughes, Jr., for appellants.

John S. Macbeth, for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The bill in this suit contains averments sufficient to warrant a recovery on the ground of an unauthorized use of the funds of the

bank to prospect for and to develop a mine on its property, and also on the ground of a willful misappropriation of its funds for the use and benefit of the appellants. We dismiss the latter ground on the threshold of this discussion, because the evidence fails to satisfy us that any of the appellants ever intended to obtain any pecuniary advantage or to make any personal gain out of the transactions under consideration at the expense of the bank, and because, if they did, a suit against them for such a fraud was barred in three years from December 23, 1889, and this suit was not commenced until October 25, 1895. Mills' Ann. St. Colo. §§ 2911, 2909. The contention of the appellee that the cause of action for fraud is not barred by this statute, because the time under it does not commence to run until the discovery of the facts constituting the fraud, has been considered. But the salient facts of this case were spread upon the books of the bank. They were all known in October, 1889, to the cashier, Clinton, who succeeded Cooper when he made the record of the resolution for the reconveyance of the mining property; and Clinton had no interest in this matter adverse to the bank, and he was its chief officer and agent. Notice to him was notice to his principal, the bank. There was no concealment, no secrecy, no deceit, in the acts of the appellant; and the time, under this section of the statute, commenced to run when the diversion of the fund was complete. In this state of the facts the receiver and the creditors and stockholders of the bank, whom he represents, stand in its shoes. Their rights here are merely those of assignees of the bank, and as such they have acquired no cause of action which the bank did not have before the receiver was appointed.

The record discloses a case in which the president, the cashier, and the majority of the directors of a bank commenced to expend money upon an abandoned mining property which it owned for the purpose of preparing it for sale, in order that the bank might dispose of it and convert it into money. The shaft and the drifts upon the property were full of water. The machinery had been silent for months. The tools had been stolen, and others were necessary to place the machinery in successful operation. When a national bank has lawfully acquired real estate or other property, it may sell that property and convert it into money; and, in order to do so, it may clean it, make reasonable repairs upon it, and put it in presentable condition to attract purchasers, in the same way that an individual of sound judgment and prudence would do if he desired to make a sale of the property. The authority to do these things is one of the incidental powers vested in the corporation under section 5136 of the Revised Statutes, which provides that a national bank shall have authority:

"Seventh. To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security; and by obtaining, issuing and circulating notes according to the provisions of this title."

The duty of exercising this power is imposed upon the directors and officers of such a bank, and the authority to determine in the first instance. when and to what extent it shall be exercised is necessarily intrusted to their judgment. Moreover, they cannot escape the discharge of this duty. They are bound to consider and decide the question at their peril. It follows that, when they have honestly and carefully considered and decided it, they ought not to suffer because, in the light of subsequent events, which could not be foreseen, it turns out that their decision was unfortunate. This mining property was unsalable with the shaft and drifts filled with water, the machinery silent, and the tools gone. It is common knowledge that a mine or a prospect for a mine is much more likely to find a purchaser, and much more likely to realize a fair price, when work is in active progress upon it, than when it is still and desolate. The officers of this bank decided to pump the water out of the shaft and drifts of this property, to put it in condition in which it could be examined by a purchaser, to start the machinery, and to do all this in the hope that by so doing they might find a purchaser for property that was unproductive and worthless in its then condition. An examination of the evidence discloses the fact that the necessary expense of placing this property in condition for examination and sale was at least $1,000, and perhaps $2,000. The directors failed to find a purchaser for the property, and the bank lost this money. But in view of the fact that the management and sale of the property was intrusted to their discretion, and that the burden of deciding whether or not this expenditure should be made was imposed upon them, we are unwilling to say that their action in expending $2,000 for this purpose. was either unauthorized, wrongful, or culpably negligent. We are of the opinion that an expenditure of this amount may be said to have been properly made in the honest exercise of a discretion vested in them, and that they ought not to be personally liable because the use of this money did not secure the purchaser they sought and expected to obtain. The unfortunate part of this case is that they did not stop here. When the shaft had been cleared of water and the machinery had been put in operation, when the property was in proper condition for examination and for sale, and when no purchaser was found, they proceeded to expend $18,864.82 more in prospecting for paying ore upon property in which none has ever been discovered. It was not only beyond their authority as officers of the bank, but ultra vires of the bank itself, to carry on ordinary mining, manufacturing, or trading business,—much more, to expend its money in such a speculative venture as prospecting for ore where none of value ever had been found. The statutes of the United States are the measure of the powers of national banks, and these corporations can lawfully exercise none but those there expressly granted, and those fairly incidental thereto. Omaha Bridge Cases, 10 U. S. App. 98, 174, 2 C. C. A. 174, 230, and 51 Fed. 309, 316; Bank v. Townsend, 139 U. S. 67, 73, 11 Sup. Ct. 496; Bank v. Kennedy, 167 U. S. 362, 366, 17 Sup. Ct. 831; Bank v. Smith's Ex'r, 40 U. S. App. 690, 704, 23 C. C. A. 80,

87, and 77 Fed. 129, 137. The officers of these banks are bound to know they are charged by the law with the knowledge of the extent and limitations of the powers of the corporations for which they act, and of their own authority as the agents of these corporations. It is said that they are not technically trustees of express trusts, but they are the agents of the bank, charged, under the national banking laws, with an implied trust to use the funds of the bank for the purposes specified in these laws, only, and to preserve them for their creditors and stockholders. Every agent incurs a personal liability to his principal for losses occasioned by his unauthorized acts under the general law, and the officers of corporations are no exception to the rule. Upon this principle the directors and the other officers of a national bank become personally liable to the bank and its successor in interest, its receiver, for losses caused by their use of its funds for unauthorized purposes, as well as for culpable negligence in their use and for their fraudulent appropriation. Williams v. McKay, 40 N. J. Eq. 189, 200; Mor. Corp. §§ 555, 556; Bank v. Wilcox, 60 Cal. 126, 141.

It is insisted, however, that there can be no recovery of the appellants in this suit on account of the diversion of the funds of this bank to the business of prospecting for ore upon its property (1) because there is a complete remedy for the appellee at law, and therefore there is no jurisdiction of this suit in equity; (2) because the liability of the appellants is several, and not joint; (3) because the appellee pleaded that the appellants fraudulently misappropriated this money for their own benefit; and (4) because the suit is barred by the statute of limitations and by laches. We will consider these objections in their order.

1. This is a suit to compel the restoration to a trust fund of $20,864.82 which the appellants unlawfully diverted from that fund, and it involves an accounting of the money diverted between the receiver and the appellants. It is therefore a suit against officers of a bank to execute a trust and to compel an accounting, and it avoids a multiplicity of suits at law. This court has repeatedly held, for reasons which now seem to us obvious, and which are stated at length in our opinions, that equity has jurisdiction of such a suit. Hayden v. Thompson, 36 U. S. App. 362, 367, 17 C. C. A. 592, 594, and 71 Fed. 60, 62; Cockrill v. Cooper, 57 U. S. App. 576, 29 C. C. A. 529, 535, 538, and 86 Fed. 7, 12, 16.

2. Are the appellants jointly liable for the misappropriation? All the appellants knew of the misappropriation while this diversion was going on. Some of them directed, and all of them consented to, it. No objection or protest or endeavor to prevent or stop it was made by any of them, and, when the amount used reached $6,800, each of them contributed $1,200 to replace a portion of the misappropriated money, and subsequently reimbursed himself for this contribution out of the funds of the bank. Each of these officers was therefore at fault, and hence liable for the entire amount diverted. When a loss has been caused by the appropriation of the funds of a corporation to a purpose unauthorized by its charter, or by culpable negligence, or by a conversion of its

funds, all the officers of the corporation who are chargeable with the fault which has occasioned the loss are liable for the entire misappropriation, without regard to the degree of dereliction of which each is guilty. 2 Lewin, Trusts, p. 1220; Williams v. McKay, 46 N. J. Eq. 25, 39, 18 Atl. 824. The appellants cannot escape here on the ground that each is separately liable for the amount which he misappropriated only, because they are all both jointly and separately liable for the entire amount diverted.

3. Must the decree be reversed because the appellee pleaded that the diversion was made with a fraudulent intent? The facts set forth in the bill are ample to warrant a recovery for the unauthorized use and loss by the appellants of the money in question in the business of prospecting for ore on the property of the bank, and these facts have been proved. But the bill contains other allegations to the effect that the appellants used and lost this money fraudulently, with the intent to get gain for themselves by causing the property on which it was expended to be conveyed to the Cassandra Company for the purpose of subsequently selling it at a profit for their individual benefit if paying ore was discovered, while they meant to saddle the loss upon the bank if the speculation proved disastrous. The appellee failed to prove these averments of fraud, and it is contended that this failure is fatal to a recovery on any ground under this bill. But the gravamen of the bill was the wrongful diversion of the trust fund. If the cause of action for the fraudulent diversion of the fund to the purpose of prospecting on this mining property for their own benefit were inconsistent with the cause of action for its diversion for the unauthorized purpose of prospecting upon it for the benefit of the bank, this objection of the appellants might be worthy of consideration. But there is no inconsistency between these two causes of action as they are stated in the bill. On the other hand, the latter cause necessarily inheres in the former, and warrants the same relief. The effect of the bill is to plead the unlawful diversion of the fund by the appellants, and then to plead that it was diverted with a fraudulent intent. If the fund was diverted to the unauthorized purpose, the cause of action was complete, whether the officers intended to appropriate the expected benefit of the speculation to their own use, or to give it to the bank, and a complainant is entitled to any relief which the facts that he pleads in his bill and establishes on the trial justify. When the ultimate facts requisite to entitle him to the relief he prays are pleaded and proved, he cannot be defeated because he also pleaded other facts not essential to his recovery, which he did not prove. Espey v. Lake, 10 Hare, 260, 264.

Another objection to the decree is that the court below allowed interest on the amount misappropriated, and it is contended that this was erroneous, because this case does not fall among those in which interest is expressly allowed by the statutes of Colorado (Mills' Ann. St. § 2252). But this is a suit in equity, and no statute is necessary to give a court of equity power to allow interest on moneys unjustly detained or misappropriated. When interest is reserved in a contract, or is implied from the nature of the promise, it becomes a part of the debt, and is recoverable as of right. When

money has been misappropriated or converted to his own use by a defendant, interest is given as damages to compensate the complainant for the loss of the use of his funds. In cases of the latter class, its allowance is sometimes a matter of discretion; but it is a general rule, both at law and in equity, that, whenever one has wrongfully detained or misappropriated the moneys of another, he must pay interest at the legal rate from the date of the misappropriation or from the beginning of the detention. Swinisen v. Scawen, 1 Dickens, 117; Redfield v. Iron Co., 110 U. S. 174, 176, 3 Sup. Ct. 570; United States v. North Carolina, 136 U. S. 211, 218, 10 Sup. Ct. 920; Jourolmon v. Ewing, 47 U. S. App. 679, 686, 26 C. C. A. 23, 27, and 80 Fed. 604, 607; Filmore v. Reithman, 6 Colo. 120, 131; 1 Sedg. Dam. §§ 301, 303.

4. Finally it is claimed that this cause of action is barred by the statute of limitations and by laches, and sections 2900, 2909, 2911, and 2912 of Mills' Annotated Statutes of Colorado are invoked to sustain this contention. Section 2900 provides that all actions of assumpsit or on the case, founded on any contract or liability, express or implied, shall be commenced within six years next after the cause of action shall accrue, and not afterwards. Section 2909 declares that, in cases of concurrent jurisdiction in the courts of common law and the courts of equity, the same limitations shall apply to suits in equity and to actions at law. Section 2911 limits the time for the commencement of suits for relief on the ground of fraud to three years after the discovery of the facts constituting the fraud. Section 2912 provides that bills of relief, in case of the existence of a trust not cognizable by the courts of common law, shall be filed within five years after the cause of action accrues, and not later. The last section does not govern the cause of action here in suit, because that cause is based on the disregard of their powers by the agents and implied trustees of a corporation, and this cause of action, as well as the trust relation from which it springs, is cognizable at law as well as in equity. It does not fall under section 2911, because fraud was not essential to its maintenance and was not proved, and the decree stands upon the simple diversion of the funds of the bank to an unauthorized purpose. It rests on the implied liability created under the law by the relation of the appellants, as its officers, to the bank. Why does it not fall under section 2900? The appropriate action at law to enforce the implied liability upon which it rests is an action on the case, and this section provides that the time for the commencement of such an action is limited to six years from the time when its cause accrued. The conclusion is inevitable that an action at law for the cause upon which this decree is based would have been governed by section 2900, and could not have been maintained six years after its cause accrued. The natural result of this conclusion is that this suit ought to be governed by the same rule, both on the ground that courts of equity usually apply the doctrine of laches in analogy to the statute of limitations relative to actions at law of like character, and on the ground that section 2909, supra, expressly requires it to be so applied.

The appellee endeavors to escape from this limitation on the

ground that these appellants were trustees of an express trust, and that consequently no time runs in their favor. It must be conceded that express trusts are not within the statute of limitations, because the possession of the trustee is presumed to be the possession of the cestui que trust. But lapse of time is a complete bar to a constructive or implied trust, both in equity and at law, unless there has been a fraudulent concealment of the cause of action, or other extraordinary circumstances which make the application of the doctrine of laches inequitable. Hayden v. Thompson, 36 U. S. App. 362, 377, 17 C. C. A. 592, 601, and 71 Fed. 60, 69. The question presented then is, are the officers of a national bank the trustees of an express trust for its creditors and stockholders, within the meaning of this rule? They are not parties or privies to any express contract or agreement to hold and use the funds of the bank for the purposes prescribed by the acts of congress. They are not parties or privies to any express declaration of trust or agreement with the stockholders or creditors of their bank which sets forth the terms on which they hold its funds for their benefit. They are the mere agents of the bank to discharge the duties imposed upon it and upon them by the law of its being, by the statutes of the United States, and the common law of the land. Their liability arises from no express agreement, but from their violation of their duties as such agents. They unquestionably stand in a fiduciary relation to the bank, to its stockholders, and its creditors, and they hold its assets in trust for these beneficiaries. But there is no express agreement or declaration of this trust to be found, and they cannot be truthfully said to be trustees of an express trust. The trust with which the property of the bank is impressed in their hands arises from the law, and from their acceptance of the office they hold. It is not an express trust arising from contract or privity, but an implied or resulting trust created by the operation of the law upon their official relation to the bank. The result is that the officers of a national bank are not the trustees of an express, but of an implied, trust for the bank and its stockholders and creditors, and statutes of limitation and the doctrine of laches may be invoked in their defense. Hayden v. Thompson, supra; Briggs v. Spaulding, 141 U. S. 132, 147, 11 Sup. Ct. 924; Mor. Corp. § 516; Spering's Appeal, 71 Pa. St. 11; Hughes v. Brown, 88 Tenn. 578, 13 S. W. 286; Wallace v. Bank, 89 Tenn. 630, 15 S. W. 448. The controversy thus narrows itself to this question: Has the bank or its receiver been guilty of such laches that they ought not to be permitted to maintain this action? Ordinarily laches runs pari passu with the statute of limitations. If the latter has barred the analogous action at law, laches has stayed the corresponding suit in equity. But if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. Kelley v. Boettcher, 56 U. S. App. 363, 375, 29 C. C. A. 14, 21, and 85 Fed. 55, 62. If the acts of the appellants upon which this suit is founded had been parts of

a continuous and persistent course of action which had wrecked this bank and robbed its creditors and stockholders, if they had been accompanied with intentional misrepresentations, if they had been purposely or negligently concealed from the other officers and employés of the bank or from its stockholders and creditors, these facts might well induce a court of equity to permit this suit to be maintained notwithstanding the statute. The case at bar presents a very different state of facts. When this money was diverted the bank was solvent and prosperous. Its management by the appellants appears to have been beneficial and successful. Its stock was selling at $325 per share of the par value of $100. The appellants sold their stock and turned over the control of the bank to others. The diversion and use of this money appeared on the books of the bank, and was known to the cashier, Clinton, who succeeded Cooper, as early as August, 1889. The bank continued in business until 1894. No complaint of the acts of the appellants was made until after its failure, and no suit was instituted until October 25, 1895. There is certainly nothing in this state of facts to warrant a refusal to permit the doctrine of laches to have its accustomed effect; nothing to induce us to suspend its application at the end of six years after the cause of action accrued when the statute of Colorado barred the analogous action at law at that time. The bank and the receiver were too late to maintain this action at the expiration of six years from the time its cause accrued.

An application of the principles and rules that have been considered will quickly dispose of this case. The appellants commenced to use the funds of the bank to clear out the shaft and prepare the property in question for sale in February, 1888. They began to divert the moneys of the bank to prospect for ore at some time before July 1, 1888; for at that date they had used $6,800 upon this property, when only $2,000 was necessary to make it presentable to purchasers. They completed their misappropriation of the moneys on April 10, 1889. The wrong was then done, the cause of action was complete, and the statute of limitations and laches would have prevented the maintenance of any suit upon it which was commenced more than six years after that date, if the operations of the appellants had stopped here. Unfortunately for the appellants, they did not. In June or July, 1888, they and Reithmann had refunded to the bank $6,000 of the $6,800 which had then been expended on the mining property, and on or about December 23, 1889, they caused the bank to repay to them this $6,000. We have already held that they were authorized to expend $2,000 to put this property in salable condition, and as this $2,000 was refunded to the bank, in the $6,000 paid to it by them in the summer of 1888, they were entitled to a return of this money in December, 1889. To that extent the repayment in that month may be sustained. But $4,000 of the $6,000 which they then received was repaid to them on account of money which they had wrongfully diverted from the funds of the bank, and for which they were personally liable. The bank did not owe them this $4,000, and they took it from its funds without lawful authority, and in violation of their trust. All their other misappropriations were made

more than six years before the commencement of this suit, and their recovery is barred by laches. But this was within the six years, and the appellee is entitled to a decree for its recovery. The decree below is accordingly reversed, and the case is remanded to the court below, with instructions to enter a decree in favor of the appellee and against the appellants for the recovery of $4,000, and interest from December 23, 1889.