## APPLICATION OF THE STATUTE OF LIMITATIONS IN CASE OF A BREACH OF TRUST.

Common Pleas Court of Hamilton County.

WILLIAM J. MCCAULEY, RECEIVER OF THE NATIONAL ENDOWMENT
COMPANY, v. THE GERMAN NATIONAL BANK
OF CINCINNATI, ET AL.

Decided, November, 1914.

*Trusts—Breach of—Statute of Limitations Applicable, When—Statute Not Tolled, Unless—Nature of an Action Brought by the Representative of the Beneficiary.*

1. The statute of limitations constitutes a bar to all actions seeking to recover trust property excepting in those cases of direct and technical trusts cognizable alone in equity, and then only in case of fraud or concealment, or where there is no remedy by action at law to which time is expressly fixed, or where there has been no open denial or repudiation of the trust brought home at the time to the knowledge of the parties in interest.
2. Where the trustee of an express trust, upon receipt of trust funds, uses those funds to pay off his own obligations, as well as the obligations of others, incurred in the general course of the business out of which the trusteeship arose, the statute of limitations will commence to run against the beneficiary of the trust immediately upon the conversion of the funds where there is no fraud or concealment apparent on the part of him to whom the trust fund is paid.
3. Even if a person so receiving trust funds be deemed to be a trustee, he is not the trustee of such a continuing and subsisting trust as will toll the operation of the statute of limitations.
4. An action brought by the representative of the beneficiary to recover the fund so converted is not an action for relief on the ground of fraud, and therefore the statute of limitations commences to run from the time of the alleged wrongful conversion.

*Constant Southworth, John C. Hermann* and *Robert C. Simmons,* for plaintiffs.

*Stephens, Lincoln & Stephens,* contra.

GEOGHEGAN, J.

This is an action brought by William J. McCauley, receiver of the National Endowment Company, a corporation under the laws of the state of West Virginia, against the German National Bank of Cincinnati, Ohio, and John R. Picton, as an individual and as trustee.

The German National Bank is defending the action, the said Picton having died prior to the trial thereof, and his administrator being in default for answer.

The facts upon which this action is based may be briefly stated as follows:

In the year 1891, a corporation known as the National Investment Company was incorporated under the laws of West Virginia. The business of the said National Investment Company was conducted from its offices in the city of Cincinnati, Hamilton county, Ohio, and consisted in the issuing of debentures, contracts of investment security or certificates, which business was declared unlawful by the Supreme Court of Ohio in the case of *State, ex rel,* v. *Interstate Savings Investment Company*, 64 Ohio St., 283, decided March 26, 1901. The National Investment Company carried on its business in the city of Cincinnati until the 4th day of December, 1900, when a suit was filed in the Superior Court of Cincinnati, seeking, among other things, the dissolution of the National Investment Company, the winding up of its affairs, the distribution of its assets, etc. The promoters of the National Investment Company were a number of men prominent in the business affairs of the city of Cincinnati, among whom were included George H. Bohrer, who was president of the German National Bank, the defendant herein, and John R. Picton, who subsequently became the president of the National Investment Company.

The evidence shows that while the suit that had been brought in the Superior Court of Cincinnati to dissolve the corporation was pending before a referee, John R. Picton, being desirous of continuing the business and having evolved a plan whereby this might be done without, as he concluded, running afoul of the law, in concert with a number of the directors of the National

Investment Company formed a corporation under the laws of the state of West Virginia, to be known as the National Endowment Company.

At the time of the filing of the suit in the Superior Court of Cincinnati, the National Investment Company had on deposit with the treasurer of the state of Ohio a sum of money approximating $55,000. This sum it had been compelled to deposit there for the purpose of doing business in this state. Simultaneously, therefore, with the incorporation of the National Endowment Company a circular letter was sent to all the debenture holders of the National Investment Company requesting them to assign to J. R. Picton, trustee, all their right, title and interest in certificates issued by the National Investment Company, including any proportionate share in all assets and funds on deposit with the state treasurer of Ohio or elsewhere in the name of the National Investment Company.

It was explained in this circular to these debenture holders that the litigation against the company had been protracted by the dilatory tactics of the prosecution; that the National Endowment Company had agreed to underwrite all the business of the Investment Company and had agreed to take over the certificates issued by the National Investment Company; that the National Endowment Company had been incorporated by the principal stockholders of the old company, that is, the Investment Company, and that to facilitate the early resumption of business the certificate holders were requested to sign a transfer enclosed and to return same, together with old certificates and unpaid dues. It was stated that the purpose of this transfer was to preserve their interest in the reserve funds of the old company for the benefit of the new certificates.

A great number of the debenture holders of the National Investment Company complied with this request and made the assignment, and to them were issued debentures of the new company, including a certificate in lieu of the amounts paid on their certificates in the old company.

However, a considerable number of the certificate holders in the old company did not comply with this request, and there-

upon Picton and his associates evolved the plan of buying out as many of these certificate holders as were willing to sell, the idea being to end the litigation which was then embarrassing the new company in the prosecution of its business. For this purpose J. R. Picton, Peter G. Thomson, H. G. Pounsford, D. James Davis, A. J. Parlin and George Kreis, being all directors of the National Investment Company, and also, with the exception of A. J. Parlin, directors of the National Endowment Company, gave their several notes amounting in all to $35,000 to the German National Bank of Cincinnati. These notes were the individual obligations of the several persons whose names were signed to the notes, as it appears from the evidence that owing to the litigation then pending against the National Investment Company, the German National Bank would not lend anything to the National Investment Company upon its own responsibility. The money obtained in this manner was placed in the hands of W. C. Wachs, then cashier of the German National bank, as trustee, and with it the said Wachs proceeded to buy up the claims of those who did not transfer their old certificates to the National Endowment Company.

When the receivership proceedings against the National Investment Company were wound up in the Superior Court of Cincinnati, an order was made by that court that Picton, trustee, be paid the sum of $16,156.23 out of the funds in the hands of the treasurer of the state of Ohio. An order was also made to pay to Wachs, trustee, out of said funds a dividend upon the amount of claims that had been assigned to him by those certificate holders who had not transferred to the new company and whose claims he had been able to buy up. The amount so ordered paid to him still left a deficit to the extent of $10,885.21, which sum was the difference between what he received from the treasurer of state and the $35,000 that had been made available to him by the giving of the notes to the German National Bank. At the same time the National Investment Company was indebted to the German National Bank upon its note for $10,700, upon which a payment of $3,000.00 had previously been made.

On or about the 5th day of August, 1904, the treasurer of the state of Ohio sent a check payable to the order of John R. Picton, trustee, for $16,156.23, being the amount that was ordered paid to him in the case in the Superior Court of Cincinnati, and the said check was endorsed and delivered by John R. Picton, trustee, to the German National Bank. Of the said sum, $10,885.21, was applied to pay the deficit in the Wachs trusteeship fund, and the balance, $5,271.02, was applied to the payment of the note of the National Investment Company in the hands of the German National Bank.

It may be stated is passing that neither the Picton trusteeship fund or the Wachs trusteeship fund received the amount from the treasurer of state that it had been anticipated each would receive for the reason that a large part of said fund in the hands of the state authorities was consumed by court costs, counsel fees, and other expenses, a thing not at all unusual but more than necessarily common in affairs of this kind.

It is upon this diversion of the amount received by John R. Picton, trustee, to the German National Bank, to pay off the notes held by it, both against the National Investment Company and the persons who created the Wachs trusteeship fund, that this action is brought, and the receiver, the plaintiff herein, seeks to recover the said amount, $16,156.23, from the German National Bank, the prayer of his petition being that the German National Bank, and John R. Picton, individually and as trustee, be decreed to have taken said sum in trust for the benefit of the National Endowment Company and its certificate holders, and that the trust be terminated and that the trustee, John R. Picton, and the German National Bank be directed to pay over to the plaintiff, as such receiver, the said sum of money.

The German National Bank, in its answer, after setting forth facts which it relies on to justify the transaction, interposed the statute of limitations to this claim, claiming that the alleged cause of action did not accrue within four years from the time of the commencement of this suit, and that for more than four years prior to the commencement of this suit the officers and directors of the National Endowment Company had full informa-

tion and knowledge as to all the transactions between the said
Picton and the German National Bank, and the said bank fur-
ther sets up the plea of the six year statute of limitations.

Now, this action was commenced on the 17th day of Novem-
ber, 1911. The alleged misappropriation by Picton occurred on
or about the 5th day of August, 1904, so that something over
seven years had elapsed between the time that the defendant
herein received the money from Picton and the time of the
commencement of this action.

Two theories are advanced by the attorneys for the receiver
herein, by which they seek to avoid the bar of the statute of limi-
tations to the maintenance of this action. The first is, that this
is a case of a continuing and subsisting trust against
which the statute of limitations does not run; and the
second is, that if it is not a case of a continuing and
subsisting trust, why then it is an action for relief on the ground
of fraud, which action is not barred until the expiration of four
years after the discovery of the fraud.

I will take up these contentions in their order because it is
obvious that unless the plaintiff can bring himself within either
of the two classes his right to maintain this action is barred by
the statute of limitations.

Now, is this a case of a continuing and subsisting trust?

An examination of all the evidence shows that if Picton was a
trustee for any purpose at all, it was for the purpose of obtain-
ing the portion of the fund in the hands of the state treasurer
assigned to him and of transferring it upon its receipt to the
National Endowment Company. I may say here in passing
that a great deal of evidence was introduced and considerable
argument made as to certain declarations made by Picton, in the
circular letters he was responsible for, in his evidence before
the referee, and in his answer and cross-petition filed in the case
in the Superior Court of Cincinnati. From these statements and
declarations, counsel for plaintiff draw a conclusion that Picton
in some way or other was to preserve this fund as a separate and
distinct entity for the benefit of those certificate holders who

transferred to the new company. I do not think that a careful examination of all the evidence in this case warrants such a conclusion. It is clear that the object of the formation of the endowment company was the carrying on of the business of the old company for the benefit of those certificate holders of the old company who assented thereto and such other persons who during the course of the business would become certificate holders.

The business of the endowment company, which I have for convenience called the new company, was carried on from sometime in the year 1901 to July, 1909, and during that time a number of payments were made in accordance with its plans to old and new certificate holders, and a number of payments were made by them to the company. It seems that at the time the certificate holders in the old company transferred to the new company, it was their intention to become members of the new company and to benefit by what they expected to be a profitable speculation. They accepted in lieu of the amounts they had paid into the old company paid-up certificates and also the obligation of the new company to pay them in accordance with the plan of redeeming the debenture bonds or certificates that had been adopted as part of its scheme. They entered, with their eyes open, into the scheme of re-organization, and they understood that the object of the re-organization was to carry on the business just as it had been carried on before, but in such a way as not to come in conflict with the authorities of the state of Ohio, who would be compelled to enforce the rule laid down in the case of *State* v. *Interstate, etc., Company, supra.* It can not be conceived that it was ever intended, either by them or Picton, to preserve for them separate and distinct from the other assets of the new company their proportion of the fund that had been in the hands of the state treasurer and assigned by them to Picton. It was their intention that it should be transferred over and become part of the general assets or at least of a general reserve for the benefit of themselves and of future certificate holders who would by their coming into the company

enable the company to make that profit which would be applied to the payment of the certificates of the new company issued to them in lieu of their certificates in the old company.

So, it appears to me that the best that can be said for the claim of the plaintiff herein in this respect is, that the fund was to be obtained by Picton from the treasurer of state and by him turned over to the National Endowment Company as a part of its general reserve fund.

However, Picton did not do this. Immediately upon its receipt he turned it over to the bank in payment of the obligations of the investment company, that is, the old company, and of the individuals who had raised the money by their notes for the Wachs trusteeship fund.

If it can be claimed that this was a violation of his duty on the part of Picton, and the bank had knowledge of Picton's trusteeship, and that this fund was held by him in the capacity of trustee, it would create the bank a trustee by implication of law; but it is clear that one who is merely a trustee by implication of law is not the trustee of a continuing and subsisting trust, and unless he is the trustee of a continuing and subsisting trust can avail himself of such provisions of the statute of limitations as may apply to the particular facts of the case in hand.

This rule is clearly laid down by our Supreme Court in the case of *Paschall* v. *Hinderer*, 28 Ohio St., 568, at page 578:

"The law, as deduced from an examination of the cases, may be thus stated:

"That the statute of limitations did not apply in courts of equity to technical or direct trusts, except in either of the following classes of cases:

"First. When there was also a remedy at law to which a limitation was fixed. In such case the equitable action to enforce the trust has a like limit.

"In other words, the statute of limitations applies to those trusts which permit of remedy for the breach either at law or in equity; that is, where there is a concurrent jurisdiction.

"Second. In cases of trusts, where there is an open denial or repudiation of the trust brought home to the *cestui que*

*trustent,* which requires him to act, and the time afterward elapsed amounts at law to a bar.

"Third.   When circumstances exist which, with the lapse of time, raises the presumption that the trust has been discharged or extinguished."

Now it is clear that the circumstances of this case do not bring it within that class of technical or direct trusts where there is no remedy at law to which a limitation has been fixed.   The cause of action accrued herein as soon as Picton obtained possession of the money from the treasurer of state.   The transaction between him and the bank constituted an effectual conversion of the deposit and if the bank accepted the money with knowledge of Picton's fiduciary capacity, why then the conversion constituted the bank, by operation of law, a trustee. And in passing here, I may say that the circumstances of this case convince me that knowledge of Picton's fiduciary capacity must be attributed to the bank by reason of George H. Bohrer's knowledge of all the affairs involving the National Investment Company's dissolution and the incorporation of the endowment company, but as a direct decision on this point is necessary in the view I have taken of this case, I do not wish to be considered as expressly determining that point.

Now I have said that this conversion constituted the bank by operation of law a trustee.   The trust was not an express trust. The trust was not created by a contract, whereby the bank assumed the position and relation of a trustee, but the law imposed upon the bank, if it imposed anything at all under the circumstances of this case, the obligation which had attached to Picton as trustee of the fund, that is, to turn it over to the National Endowment Company.

The statute of limitations commenced to run against the National Endowment Company as soon as the right of that company accrued to demand from Picton the money which he had received from the treasurer of state, and unless it can be determined from the circumstances of this case that the cause of action accruing to the endowment company upon this conversion

was fraudulently concealed from it by the bank, the six year statute of limitations would be a bar to this action, the action accruing to the endowment company upon Picton's receipt of the money and his conversion thereof being an action wherein there was a remedy at law, to-wit: assumpsit, or it may be trover, or wrongful conversion.

This is in accord with the doctrine laid down in *Yearly* v. *Long*, 40 Ohio St., 27; *Douglas* v. *Corry*, 46 Ohio St., 349; *Welter* v. *Bible Society*, 50 Ohio St., 1; *Kane* v. *Bloodgood*, 7 Johnson's Chan., 90; *Finney* v. *Cochran*, 1 Watts and Serg., 112; *Roberts* v. *Ely*, 113 N. Y., 128; *Pierson* v. *McCurdy*, 33 Hun., 520; *Cooper* v. *Hill*, 94 Fed., 582; *University* v. *State National Bank*, 96 N. C., 280; *Haynie* v. *Hall's Ex'r.*, 5 Humphrey (Tenn.), 290; *Kennedy* v. *Baker*, 59 Texas, 150, and many other cases both in this country and in England too numerous to cite in this already too long opinion.

Referring, however, to the case of *Douglas* v. *Corry, supra*, which was a case where an attorney had collected money which belonged to the plaintiff, and which he was under the duty of turning over to her but which he did not do, it was held that it was not a continuing and subsisting trust which was capable of being enforced against his executor, and that the statute of limitations ran from the time the money was received and should have been turned over. The court, referring to the rule in equity that actions to enforce direct and technical trusts are usually not subject to the bar of the statute, says on pages 351 and 352:

"The provision of our code of procedure excepting from the statute of limitations 'the case of a continuing and subsisting trust' (Section 4974, Revised Statutes) is simply an incorporation of this rule. The word 'trust' is frequently used in a very comprehensive sense; and, as is well said in *Finney* v. *Cochran, supra*, to hold that the statute of limitations is not applicable to any case which may, even with propriety, be denominated a trust, would, in a great measure, defeat the plain and manifest intention of the Legislature. No equitable relief is required in his case; and the remedy adopted is a plain action at

law for money had and received; and is not then a case of a
continuing and subsisting trust cognizable only in equity.''

The same doctrine prevails, with few exceptions, in all the
cases that I have read and which were furnished me by the un-
tiring zeal and industry of counsel in this case, and it seems to
me that the clear weight of authority is that the statute of limi-
tations will be a bar to all actions seeking to recover trust proper-
ty, excepting in those cases of direct and technical trusts cog-
nizable alone in equity, and then only in case of fraud or con-
cealment, or where there is no remedy by action at law to which
time is expressly fixed, or where there is no open denial or re-
pudiation of the trust brought home at the time to the knowledge
of the parties in interest.

Now it does not appear in this case that there was any cir-
cumstance of fraud or concealment that would toll the running
of the statute as against the implied or constructive trust that
the law would place upon the bank. However, it is not neces-
sary at this point to discuss the evidence in this respect, as I
will take it up more in detail in discussing the question as to
whether or not this is an action for relief on the ground of
fraud.

So, it seems to me that this can not be considered as a case of
a continuing and subsisting trust.

Is this an action for relief on the ground of fraud?

In the first place we must determine whether or not on the
part of the bank or its officers there was any fraud.

It is clear that the mere taking of the money by the bank,
knowing at the time that Picton was a trustee, would not of
itself justify the assumption that there was fraud on the part
of the bank. We must examine all the circumstances surround-
ing the transaction in order that we may determine whether or
not there was any fraud herein on part of the bank.

If we assume that the bank is chargeable with whatever knowl-
edge its president, George H. Bohrer, had of all these transac-
tions, what have we here?

It is clear that the primary purpose of the Picton trusteeship was to stop litigation and enable the certificate holders of the old company to be transferred, practically without interruption to their rights, to the new company. It was for the purpose of stopping litigation and the further embarrassment of the new company that the Wachs trusteeship was formed. The whole idea of the entire transaction, both on the part of the certificate holders and the directors of the old and new companies, was to evade litigation and the consequences of the ban that had been placed upon the business by our Supreme Court, and it was to accomplish these purposes that these trusteeships were formed.

Nowhere in the evidence does it appear that in so far as those certificate holders of the old company who transferred to the new company are concerned, they had any definite idea that anything would be particularly done with their proportion of the fund, then in the hands of the treasurer of state, other than that it would be transferred to the endowment company, and they entered the endowment company because in their opinion the endowment company would be able to carry out for them the contract of the investment company and thus enable them to make that profit which they had anticipated and speculated upon when they entered the investment company originally.

At the time of the creation of the Wachs trusteeship, Picton, who was the controlling spirit of this whole affair, guaranteed to the bank that he would back up the payment of the notes, that had been given to raise the funds to create the Wachs trusteeship, out of any funds that would come into his hands in the future. He also agreed to pay out of said fund any indebtedness which the investment company had contracted with the bank. The bank had been prevailed upon to forego presenting its claim against the investment company to the receiver of the investment company, and the only conclusion that it could come to was to assume that the endowment company was simply and solely a re-organization of the investment company.

The bank knew that Mr. C. B. Matthews was the attorney for both the investment company and the endowment company,

that he had passed upon the legal aspects of and was partially responsible for the plans whereby the two trusteeships had been created, and that Mr. Matthews had passed upon the plans for the organization of the endowment company and upon the legality of its existence and its right to do business and that he in all affairs represented that company and its directors. Now, on the day, to-wit: August 5, 1904, when Picton endorsed the check received by him from the treasurer of state over to the bank, and the bank applied the proceeds of said check as hereinbefore indicated, the bank received from Mr. Matthews a letter stating in effect that the said J. R. Picton was authorized to make the application of the fund in his hands to the liquidation of the balance of the Wachs trusteeship claim and the note for $8,000, which the bank was holding for some time. The bank did this, the accounts were carried through the books, and it is not apparent to me that any effort was made to conceal the transaction from anybody who might have an interest therein.

Though the manner of the bank in handling this transaction may not have been of the most approved methods of accounting, I can not be convinced that there is sufficient evidence in this case to justify me in holding that the bank was guilty of fraud against the certificate holders or the National Endowment Company itself.

Counsel for the plaintiff insists that the evidence is sufficient to justify the claim that there was fraud in the transaction to be attributable to the bank. He refers to a certain case brought by one Rist, one of the debenture holders of the old company, to enforce a stockholder's liability against the stockholders of that company. He points to what he claims to be a devious method on the part of the bank in carrying its account of the fund turned over to it by Picton. He suggests that it is suspicious that the bank would permit itself to hold the bag to the extent of the difference between the $5,271.02, which was applied to the payment of the old company's note held by the bank, and the $8,000 or more which was at the time due upon the note, and he points to other circumstances which he says are suspicious and raise the presumption of fraud.

I must confess that at the outset and before mature reflection upon the matter I was considerably impressed by his vigorous portrayal of these so-called suspicious circumstances, and was inclined to believe with him that they were badges of fraud. However, upon reflection, and having in mind the principle that fraud must be proved by clear and convincing proof, I have come to the conclusion that no substantial inference of fraud can be drawn from these circumstances.   Fraud involves moral guilt or intention to do wrong.   No such intention on the part of the bank plainly appears from the evidence.   While the mere conversion of funds may give a right to a cause of action, this cause of action does not depend upon any moral obliquity on the part of the one guilty of the conversion or participating in it, but the law gives relief independently of any moral guilt and in cases of mere mistake as to one's right.   The fact that I was impressed at first by the so-called suspicious circumstances, only goes to show how salutary is the rule that fraud must be proven by clear and convincing proof, because if it were not so, many otherwise reputable men, by reason of mere mistakes in transacting business, which might be calculated to arouse suspicion, would be adjudged guilty of fraud.

But even if it be assumed that the conversion by the bank was a fraud of the rights of the certificate holders, as claimed in the petition, the action herein sought to be enforced can not be considered as one for relief on the ground of fraud, but rather an action for trover or an action for money had and received.

In order to constitute the basis of an action for relief on the ground of fraud and to toll the running of the statute to the time that the fraud is discovered, the gist of the action must be fraud.   Now the taking of property by force, or the wrongful conversion of property, are actions that were cognizable at law, and are not in the class of those cases which in equity were known as actions for relief on the ground of fraud, and while it is true that under the code actions for relief on the ground of fraud are not to be confined to cases which were formerly of exclusive cognizance in courts of equity, yet the term "relief

on the ground of fraud'' can not be extended to cases in which fraud is not the gist or foundation of the action. This principle is clearly set forth in *Howk* v. *Minnick*, 19 Ohio St., 462; *Carr* v. *Thompson*, 87 N. Y., 160; *Atchinson Railway Company* v. *Atchinson Grain Company*, 68 Kan., 585; *Brown* v. *Bank*, 2 Kan. App., 352; *Clausen* v. *Meister*, 93 Cal., 555.

In all these cases that section of the statute of limitations concerning actions for relief on the ground of fraud was discussed, and the statute under discussion was substantially the same as the statute in Ohio.

In *Carr* v. *Thompson, supra,* which was a case where an agent received money and by rendering false and fraudulent statements, and attempted to cheat and defraud plaintiffs obtained from them and converted to his own use upward of $11,-000, and the petition seeking to recover this amount was based upon his his alleged fraud in the transaction, the court in its opinion said in referring to the cause of action stated in the petition:

''An allegation of fraud was in no sense essential to its perfect and correct statement; it could stand without it; omitting every such allegation it could still successfully defy a demurrer; it can not be said to be founded on fraud, when that element is not essential; the proof of fraud becomes only necessary as the fit answer to a possible defense. * * * So that the sole question presented is, whether the defendant, acting as an agent, properly performed his duty in such relation, and if he failed so to do, is liable, whether such failure was intentional and fraudulent, or not.''

However, as I said before, even though this be regarded as an action for relief on the ground of fraud, and I am of the opinion that it can not be so correctly regarded, I am of the opinion that the plaintiff has failed to prove fraud. It has become so trite in Ohio that it needs no citation of authority to support it, that fraud is never presumed but must be proved by clear and convincing evidence. I take this to mean that the circumstances brought forward in the evidence must be of such a nature as to leave no fair or reasonable inference to be drawn

from them other than the inference of fraud. This does not appear clearly to me. The burden of proving it is upon the plaintiff, and he must produce that measure of proof which the law requires in cases of fraud. The burden is also placed upon him, where he claims fraud, of not only proving the fraud but of proving that he did not discover the fraud until within four years of the time when the action was brought. *Combs* v. *Watson*, 32 Ohio St., 228.

This is not only the rule in Ohio, but seems to be the rule laid down by many respectable authorities in other states having codes similar to that of Ohio. *Morrill* v. *Little Falls Mfg. Co.*, 53 Minn., 371; *Hooker* v. *Worthington*, 134 N. C., 283; *Arnett* v. *Coffey*, 1 Col. App., 34; *Castro* v. *Geil*, 110 Cal., 292.

Now in this connection there can be no doubt but that the order of the Superior Court of Cincinnati directing the treasurer of state to pay a portion of the fund in his hands to Picton, trustee, was made in a matter wherein the court had jurisdiction, and in a case wherein all of the certificate holders of the investment company were interested, by reason of the fact that the action was brought on their behalf by the plaintiff, who himself was a certificate holder. The receipt of the money under that order can not be said to have been concealed from anyone, because it was a matter wherein a proper and duly accredited officer of the state of Ohio performed a function of his office by and under the authority of an order of a court of competent jurisdiction. Therefore, anyone who had the desire could have known of the receipt of the money. While it is true that two of the certificate holders of the investment company, who transferred to the endowment company, testified that they had no knowledge of this transaction, I do not think this is evidence sufficient to justify any assumption that anything was done by Picton or the bank to conceal the transaction from the officers and members of the endowment company. So, it would seem that even in this respect the burden placed upon one alleging fraud, by the doctrine laid down in *Coombs* v. *Watson, supra*, has not been sustained here.

I am not aware that the rule laid down in some states, that a person alleging fraud must not only show that he did not discover it, but also that he exercised reasonable diligence to discover it, is the law of Ohio, but I think the rule is that the person alleging fraud has upon him the burden of proving that he did not discover the fraud within four years from the time when the action was brought.

Some reference has been made to the case of *Winder* v. *Scholey,* 83 Ohio St., 204.

That was a case where the defendants had obtained property from a testator by a promise to hold it in trust for the benefit of the testator's lodge. They denied the trust. The action was one to enforce it. Their obtaining the property on such express promise and their failure to carry out the promise constituted undoubted fraud. The action was between the trustees and the *cestui que trust,* and was to enforce a direct or technical trust which had been created by a contract between the trustees and the creator of the trust, and which the trustees were fraudulently seeking to avoid

I can not see where the decision of that case has any particular bearing upon the case at bar.

I am well aware that the various propositions that I have endeavored to lay down as applying to the circumstances that are before me in this case have been in some measure or other disputed by eminent authority. I have felt that it was my duty, in view of the splendid efforts made by all the counsel concerned in this case, to read every case and every authority that has been cited to me. As these undoubtedly embraced every decision upon the principles herein involved in this Union and even in England, it can be seen that the task that was placed upon me was no easy one, but I am convinced that the principles which I have applied in this case are supported by the great weight of authority and are correct.

Therefore, the petition of plaintiff will be dismissed, as well as the cross-petition of William L. Meyer, a defendant herein, and judgment will be entered for the defendant the German National Bank, for its costs.