## RANKIN v. COOPER et al.

(Circuit Court, W. D. Arkansas. E. D. January 16, 1907.)

No. 1,162.

1. BANKS AND BANKING—NATIONAL BANKS—DUTIES AND RESPONSIBILITY OF DIRECTORS.

It is the duty of directors of a national bank to exercise reasonable control and supervision over its affairs, and to use ordinary care and diligence in ascertaining the condition of its business, which is such care as a ordinarily prudent and diligent man would exercise in view of all the circumstances.

2. SAME.

Directors of a national bank are not insurers or guarantors of the fidelity and proper conduct of its executive officers, and are not responsible for losses resulting from the wrongful acts or omissions of such officers, provided they have exercised ordinary care in the exercise of their own duties as directors.

3. SAME.

If nothing has come to the knowledge of the directors of a national bank to awaken suspicion that something is going wrong, ordinary attention to the affairs of the institution is all that is required of them, but if, on the other hand, they know, or by the exercise of ordinary care should know, any facts which should awaken suspicion and put a prudent man on his guard, then a degree of care commensurate with the danger to be avoided is required, and a failure to exercise such care makes them responsible.

4. SAME.

Directors of a national bank are not expected to watch the routine of every day's business, but they should have a general knowledge of the manner in which the bank's business is conducted, and upon what securities its larger lines of credit are given, and generally know of and give direction to its important and general affairs.

5. SAME.

It is incumbent upon the directors of a national bank in the exercise of ordinary prudence, and as a part of their duty of general supervision, to cause an examination of the condition and resources of the bank to be made with reasonable frequency.

6. SAME.

Where the directors of a national bank became aware, through the report of a committee of their number, and also by notices sent them individually by the Comptroller of the Currency, that the bank had been making excessive loans to its president and to other persons, firms, and corporations with which he was associated, but took no effective steps to reduce such loans, or to prevent their increase, which continued until the bank became insolvent, they will be held jointly and severally liable for all losses which the bank sustained through subsequent transactions and which could have been prevented by a proper discharge of their duties.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Banks and Banking, § 947.]

7. SAME—SUIT TO CHARGE DIRECTORS—LIMITATIONS.

Where a national bank suffered losses through the continued negligence of its directors, which was unknown to its creditors, and such directors remained in control until the appointment of a receiver on the bank's insolvency, a court of equity will entertain a suit to charge them with personal liability, notwithstanding the fact that an action at law to recover for their wrongful acts would be barred by limitation under the laws of the state.

8. SAME—DEFENSES—ABSENCE OF DIRECTOR.

The mere fact that a director of a national bank does not attend to his duties by reason of continued ill health or other business engagements does not necessarily relieve him from liability for losses sustained by the bank through the failure of the directors to exercise proper care and supervision over its affairs.

9. SAME—NEW DIRECTORS.

While a director of a national bank ought not to be held responsible for the conduct of its business from the very day of his election, if he has not been a director before, he becomes responsible for acts or omissions from the time he acquires knowledge of the bank's condition and begins to actively participate in its affairs.

In Equity. On exceptions to master's report.

John M. Moore, for complainant.

Rose, Hemingway & Rose, John McClure, and Morris M. Cohn, for defendants.

FINKELNBURG, District Judge.* This suit was originally brought on the 19th day of June, 1895, by Sterling R. Cockrill, the predecessor of George C. Rankin, the present receiver of the First National Bank of Little Rock, against 16 directors of said bank, to recover losses alleged to have been sustained by said bank by reason of alleged negligence and violations of the laws of the United States governing the management of national banks. In the course of its prolonged history four of the original defendants have dropped out of the case by deaths and failure to revive, and by dismissals for other causes, so that at present there are but 12 left, who are as follows: Gus. Blass, John W. Goodwin, H. G. Fleming, James Joyce, Mark M. Cohn, Charles T. Abeles, P. K. Roots, and the estates of Nick Kupferle, Henry M. Cooper, William Farrell, Logan H. Roots, and C. M. Taylor. The case has been prolonged by the interposition of numerous motions and demurrers, and by an appeal from a decision sustaining one of those demurrers, which decision was afterwards reversed by the Circuit Court of Appeals, as will more fully appear from the report of that decision under the name of Cockrill v. Cooper, 86 Fed. 7, 29 C. C. A. 529, to which reference is hereby made for further statements of facts. In 1900, after the case had been reversed and remanded, the taking of testimony was begun before a master in chancery under an order of reference, and the case was finally heard and submitted on the merits in February, 1906. The testimony is very voluminous, embracing several thousand pages, there are over 100 exhibits, and the questions involved are complicated. I have given the matter much consideration —all the consideration which other pressing duties would permit since the case was submitted—and I realize now that a decision ought not to be delayed any longer.

At the threshold of this case it must be said that the testimony does not show that any of the defendants in this proceeding gained or intended to obtain any pecuniary advantage or to make any improper personal gain out of the various transactions involved. So far as the evidence shows, the defendants were men in good standing in the community, and many of them active business men of high standing. Nor does it appear that they were guilty of knowingly assenting to or participating in the malversations of funds by the president of the bank which wrecked this one-time flourishing financial institution. The question rather is whether they were guilty of neglect in not knowing or ascertaining these things and in not taking steps to prevent or remedy them—such culpable neglect as would make them liable under the general principles of the common law governing the duties of bank directors which apply to national banks as well as all other banks, and also under section 5145, Rev. St. [U. S. Comp. St. 1901, p. 3463]— the national bank law—which provides that the affairs of such banks shall be managed by not less than five directors, and section 5147,

*By assignment.

which makes it incumbent on every such director to diligently administer the affairs of such banks.

Briefly summarized, I understand the law on this subject to be as follows: (1) Directors are charged with the duty of reasonable supervision over the affairs of the bank. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision over its affairs. (2) They are not insurers or guarantors of the fidelity and proper conduct of the executive officers of the bank, and they are not responsible for losses resulting from their wrongful acts or omissions, provided they have exercised ordinary care in the discharge of their own duties as directors. (3) Ordinary care, in this matter as in other departments of the law, means that degree of care which ordinarily prudent and diligent men would exercise under similar circumstances. (4) The degree of care required further depends upon the subject to which it is to be applied, and each case must be determined in view of all the circumstances. (5) If nothing has come to the knowledge to awaken suspicion that something is going wrong, ordinary attention to the affairs of the institution is sufficient. If, upon the other hand, directors know, or by the exercise of ordinary care should have known, any facts which would awaken suspicion and put a prudent man on his guard, then a degree of care commensurate with the evil to be avoided is required, and a want of that care makes them responsible. Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. (6) Directors are not expected to watch the routine of every day's business, but they ought to have a general knowledge of the manner in which the bank's business is conducted, and upon what securities its larger lines of credit are given, and generally to know of and give direction to the important and general affairs of the bank. (7) It is incumbent upon bank directors in the exercise of ordinary prudence, and as a part of their duty of general supervision, to cause an examination of the condition and resources of the bank to be made with reasonable frequency. I have drawn the foregoing propositions largely from the leading cases of Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, Gibbons v. Anderson (C. C.) 80 Fed. 345, Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428, 28 L. Ed. 49, Warner v. Penoyer, 91 Fed. 588, 33 C. C. A. 222, 44 L. R. A. 761, Cockrill v. Cooper, 86 Fed. 7, 29 C. C. A. 529, and the recent decision of the Supreme Court of Ohio in the case of Mason v. Moore, 76 N. E. 932.

In applying the foregoing rules to the present case, I will first speak of the directors collectively, leaving any discriminations to be made between them for subsequent consideration. Briefly stated, it appears from the evidence that up to June 19, 1890, when H. G. Allis was elected president of the First National Bank of Little Rock, it had been a successful and prosperous institution; that soon after Allis assumed charge of its affairs he began to divert the proceeds of the bank partly in the form of improvident, excessive, and improper loans to himself, and partly in the shape of improvident, excessive, and improper loans to other persons and corporations with whom he was affiliated and engaged in speculative enterprises, notably the City Electric Street Railway Company of Little Rock, the McCarthy-Joyce Com-

pany, a mercantile company of Little Rock, the Press Printing Company, a corporation of Little Rock, and a number of other corporations and individuals which will be hereafter more particularly referred to. This diversion and misappropriation of the funds of the bank continued from June 19, 1890, until February 1, 1893, when the bank closed in an utterly insolvent condition, and a receiver was appointed to wind up its affairs. It appears that after realizing what could be realized on the assets of the bank, and after an assessment on the stockholders, there still remained a balance of $300,000 due and unpaid.

It further appears from the evidence that during the excellent administration of the affairs of this bank by Col. Logan H. Roots, the predecessor of Allis, the directors gradually fell into the habit of permitting the executive officers to manage the business of the bank with very little, if any, supervision on their part. There were no periodical examinations made by examining committees such as were customary in other banks at Little Rock and banks generally. The directors simply trusted Col. Roots and the executive officers acting under him. It appears that this policy of trusting and relying upon the president, cashier, and their assistants was tacitly transferred to Mr. Allis and his staff when he came into office in June, 1890, and the business of the bank was carried on in the traditional way, without any disturbing cause calculated to arouse suspicion or inquiry on the part of the directors until about the month of July, 1891, when rumors began to circulate in and about Little Rock unfavorable to Allis' management of the bank's affairs, and at the request of Dr. G. M. Taylor, one of the directors, a committee was appointed to examine the affairs of the bank, which committee made an elaborate report on the 25th day of November, 1891. In this report the attention of the board is directed to the large indebtedness of Mr. Allis and of his "immediate associates and enterprises," and that "they merit more careful consideration." It is also stated in this report that the committee does not think that the securities in the case of the City Electric and Belt Railways would sell for enough at that time to liquidate the indebtedness, and it is suggested that an early liquidation or payment in full of these accounts, together with a large reduction of Mr. Allis' personal indebtedness, is deemed desirable. It seems that about the same time a government examiner made an examination which led to a letter from the Comptroller of the Currency, dated November 28, 1891, addressed to the cashier, and to which personal attention was also called by an individual notice from the Comptroller mailed to each director. In this letter, which is lengthy, the Comptroller calls attention to the loans to Mr. Allis, the City Electric Railway Company, the Belt Line, Bradford & Brown, and alludes to Allis' connection with those parties and companies, and reminds the directors that the "use of the funds of a bank by any officer to forward his interests in any speculative enterprises is most reprehensible and dangerous, and the directors of your bank, who are by law made responsible for the management of its affairs, should spare no efforts and lose no time in eliminating all paper of this character from the assets of your bank." The Comptroller in this letter also admonishes the directors that it is the duty of the board to meet more frequently, and that "the conduct of the affairs of a national bank

is by law devolved upon the board of directors, and regular and frequent meetings are therefore very desirable." This letter presumably reached the bank on or about December 1, 1891, and was answered by the board in a lengthy reply December 8, 1891, signed by all the directors individually, except three (Logan H. Roots, William Farrell, and C. M. Taylor), reported as absent from the meeting at which the reply was agreed upon. In this letter the directors undertake to answer the Comptroller's criticism in many particulars, and show an apparent familiarity with the bank's affairs. They also express continued confidence in Mr. Allis' management and in the success of the bank. Notwithstanding all these warnings and admonitions, the directors seem to have proceeded in the same passive way as they did before, relying on Mr. Allis to straighten things out. Instead of that, however, Mr. Allis involved the institution more and more, finally leading to absolute ruin to himself as well as the bank. Even though the bad debts existing at the period referred to could not be recovered or reduced, no adequate effort, indeed no effort whatever, seems to have been made by the defendants to arrest their increase after they had been warned by the Comptroller and a committee of their own body. They failed to arouse themselves from their lethargy.

As has been well said, the courts in dealing with instances of negligence by the directors of banks "are under perplexing restraint lest they should, by severity in their rulings, make directorships repulsive to the class of men whose services are most needed, or, by laxity in dealing with glaring negligences, render worthless the supervision of directors over national banks, and leave these institutions a prey to dishonest executive officers." Robinson v. Hall, 63 Fed. 225, 12 C. C. A. 677. With grave misgiving as to the liability of the members of the board for the wrongdoings of the president and his associates prior to December 1, 1891, I have finally determined upon that date as indicating a period of time when the members of the board certainly had been sufficiently warned to arouse suspicion, and when they either knew, or by the exercise of ordinary care should have known, that the affairs of the bank were being imperiled by Mr. Allis and his associates, and it follows from the rules of law, hereinbefore referred to, that the directors should be held liable for all losses that could have been prevented by a proper discharge by them of their duties after December 1, 1891. I need hardly add that I have reached this conclusion with great reluctance, because the neglect of a proper supervision of the bank was in a sense unintentional, and because many of the defendants have already sustained severe losses as stockholders and depositors; but, on the other hand, the court cannot ignore the rights of innocent third persons who confided in this bank, relying upon the protection which the names of these directors and a proper discharge of their duties held out to the public.

As to the statute of limitations, I have come to the conclusion that it does not apply, because the case in my opinion falls under the exceptional circumstances referred to by Sanborn, J., in Cooper v. Hill, 94 Fed. 582, 36 C. C. A. 402, circumstances under which a court of equity will permit a suit to be maintained notwithstanding the statute (see pages 590, 591 of 94 Fed., pages 410, 411 of 36 C. C. A.),

and also because at the time of the commission of the wrongful acts in question and afterwards, until the appointment of a receiver, the defendants who were concerned therein constituted a majority, if not the whole, of the board of directors, and that in consequence of their having full control of the corporation no suit could be brought to redress the alleged grievances until a receiver was appointed. See Judge Thayer's opinion in Cockrill v. Abeles, 86 Fed. 505, loc. cit. 512, 30 C. C. A. 223, 230.

A special defense is set up by the executors of Logan H. Roots, deceased, on account of ill health and absence from the city, and in that connection Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, has been referred to. I think a passing illness, temporary in character, is an excuse for the period it lasts, but, if a person becomes a confirmed invalid for a number of years and unable to attend to the duties of a director, he has no right to hold on to the position and at the same time decline its corresponding responsibilities. By doing so he invites others to trust the bank on the strength of his name, and in such case he ought to bear his share of the consequences growing out of such a dual situation. This is peculiarly applicable to Col. Roots because of his high reputation in the community and the great trust that was placed in him as a director, as abundantly appears from the evidence in this case. Nor does it appear from the evidence that Col. Roots was in fact such an invalid that he could not give any attention to the affairs of the bank. On the contrary, it appears that he attended 46 meetings in 1890; 38 in 1891; 48 in 1892, and 9 in January, 1893. He also in writing indorsed and approved the report of the examining committee of November 25, 1891, signed the letter to the Comptroller of January 16, 1892, was re-elected and accepted the office of president in January, 1893, and accepted the office of receiver for this bank when it closed. Defendant Blass in his testimony says:

"Logan H. Roots attended the board meetings whenever he was in the city. Being an old bank man, he was counseled in all matters of the bank by myself and directors. He had access to the books and papers of the bank at all times as a director."

Several other directors and a number of witnesses testified that Logan H. Roots had been identified with the bank for many years; that he was a man of unusual business ability; that they saw no change in his mental capacity down to the last; and that they relied very largely on his advice. The situation is not like that of Charles T. Coit in Briggs v. Spaulding, supra. Mr. Coit proclaimed his sickness and inability to act by asking for and obtaining a year's leave of absence. The court held that he had a right to act upon this leave of absence, and that he should not be held responsible for what occurred during such absence. It is also urged in defense of Col. Roots that he was necessarily absent from Little Rock a great deal, and hence unable to attend many board meetings. The same defense is made on behalf of defendant Blass, who spent much of his time in trips to the East in connection with his mercantile business. But to permit this to operate as a defense in a case of this kind would be putting a premium on the

failure to attend board meetings and a penalty on those who attend regularly.

The next question is: What should be the measure of damage in a case like this, and what the extent of liability of each party? The question is involved in complications and difficulties. Counsel have given the court no aid in this direction. The prayer in the bill of complaint is general in language. Nor has complainant's counsel suggested any definite theory on this subject, either in oral argument or brief. Nor, after a long search, have I been able to find analogous precedents throwing light on the situation as it presents itself in this case, so that the court is left to carve out a decree for itself according to what, to it, would appear to be right and just under the general principles of law heretofore announced as applied to the evidence in this case. It should be mentioned, however, in this connection, that the Circuit Court of Appeals of this circuit has in the case of Cooper v. Hill laid down this general rule that:

"When a loss has been caused by the appropriation of the funds of a corporation to a purpose unauthorized by its charter, or by culpable negligence, or by a conversion of its funds, all the officers of the corporation who are chargeable with the fault which occasioned the loss are liable for the entire misappropriation, without regard to the degree of dereliction of which each is guilty." Sanborn, J., in Cooper v. Hill, 94 Fed. 582, 36 C. C. A. 402.

An examination of the bill of complaint in this case has led me to the conclusion that it states a common-law cause of action for damages sustained by the bank by reason of losses caused by the negligence of the directors so far as improvident loans to Mr. Allis and his associates are concerned. But that in regard to improvident loans to the City Electric Railway Company, the McCarthy-Joyce Company, and the Press Printing Company, complainant has expressly limited the right of recovery to the excess over the 10 per cent. limitation imposed by the national bank act, viz., $50,000. I find from the evidence in this case that, aside from these three corporations, the persons and corporations referred to in the bill as Allis' associates in speculative enterprises to whom loans were made for Mr. Allis' use, and whose notes were used in reduction of or substitution for his indebtedness, were the following: Bradford & Brown, H. P. Bradford, Bradford, Taylor & O'Connell, H. G. Fleming, Belt Railway Company, Capital Construction Company, Capital Street Railway Company, and Electric Addition Company.

I further find from the evidence that the terms of service of the present defendants as directors of the bank were as follows: N. Kupferle, Gus Blass, John W. Goodwin, and Logan H. Roots, served from June 2, 1890, and prior thereto, up to the close of the bank; Henry M. Cooper from October 19, 1891, to the close of the bank; H. G. Fleming from October 19, 1891, to January 23, 1893; Mark M. Cohn from June 2, 1890, and prior thereto, up to January 12, 1892; Charles T. Abeles from January 12, 1892, to the close of the bank; James Joyce from January 12, 1892, to January 10, 1893; P. K. Roots from June 2, 1890, to January 16th, 1891; C. M. Taylor from January 16, 1891, to November 6, 1891; and William Farrell **from January 16, 1891, to November 28, 1891.**

As to the claim made against the defendant directors on account of the so-called "raised balances," I find in favor of the defendants on the law and the evidence applicable thereto.

As to dividends, I find that the last dividend declared January 10, 1893, was declared and paid contrary to the statutory restrictions, and that those defendants who were directors at that time are responsible for the amount thereof as funds improperly diverted from the assets of the bank.

In view of the premises, as hereinabove stated, the court now finds and adjudges that a decree should be entered against defendants Gus Blass, John W. Goodwin, H. G. Fleming, and the estates of Logan H. Roots, Nick Kupferle, and Henry M. Cooper, as follows: (1) For all losses sustained by the bank by reason of any increase in the amount of money loaned to or permitted to be drawn by Mr. Allis and his associates, viz., Bradford & Brown, H. P. Bradford, Bradford, Taylor & O'Connell, H. G. Fleming, Belt Railway Company, Capital Construction Company, Capital Street Railway Company, and Electric Addition Company, after December 1, 1891, and up to February 1, 1893, when the bank closed. (2) For all losses sustained by the bank by reason of any money loaned to or permitted to be drawn by the City Electric Street Railway Company, the McCarthy-Joyce Company, and the Press Printing Company, or either of them, since December 1, 1891, in excess of a total indebtedness of $50,000 on the part of either of said corporations; the liability on account of these three corporations being for such increase in excess only. (3) For any losses sustained by the bank by the declaration and payment of the dividend of January 10, 1893.

The court finds and adjudges that a decree should be entered against defendant Mark M. Cohn (1) for all losses sustained by the bank by reason of any increase in the amount of money loaned to or permitted to be drawn by Mr. Allis and his associates, being the persons hereinbefore designated as such in the decree against Gus Blass et al., after December 1, 1891, and up to January 12, 1892, when defendant Cohn went out of office; (2) for all losses sustained by the bank by reason of any money loaned to or permitted to be drawn by the City Electric Street Railway Company, the McCarthy-Joyce Company, and the Press Printing Company, or either of them, after December 1, 1891, and up to January 12, 1892, in excess of a total indebtedness of $50,000, on the part of either of said corporations, the liability on account of these three corporations being for such increase in excess only.

A director ought not to be held responsible for the conduct of the business of a bank from the very day of his election if he has not been a director theretofore, but the evidence shows that defendant Abeles was put on the discount committee at once, and he was present at the board meeting of February 13, 1892 (30 days after his election), when the directors manifested a very anxious state of mind about the bank's finances, and when the telegram from Mr. Allis was received concerning the negotiations of his speculative stocks in New York. I think this was sufficient warning to Mr. Abeles, and that his responsibility ought to begin on that day.

The court therefore finds and adjudges that a decree should be entered against defendant Charles T. Abeles, as follows: (1) For all losses sustained by the bank by reason of the increase, if any, in the amount of money loaned to or permitted to be drawn by Mr. Allis and his associates, being the persons hereinbefore designated as such in the decree against Gus Blass et al., after February 13, 1892, and up to February 1, 1893, when the bank closed. (2) For all losses sustained by the bank by reason of any money loaned to or permitted to be drawn by the City Electric Street Railway Company, the McCarthy-Joyce Company, and the Press Printing Company, or either of them, after February 13, 1892, in excess of a total indebtedness of $50,000 on the part of either of said parties; the liability on account of these three corporations being for such increase in excess only. (3) For any losses sustained by the bank by the declaration and payment of the dividend of January 10, 1893.

As to defendant Joyce, the evidence shows that the circumstances of his election and his relations to Mr. Allis and the bank were such that a 30-day period should be sufficient interval between election and responsibility for future management.

The court, therefore, finds and adjudges that a decree should be entered against defendant James Joyce, as follows: (1) For all losses sustained by the bank by reason of the increase, if any, in the amount of money loaned to or permitted to be drawn by Mr. Allis and his associates, being the persons heretofore designated as such, after February 12, 1892 (being 30 days after he was elected a director), and up to January 10, 1893, when he went out of office. (2) For all losses sustained by the bank by reason of any money loaned to or permitted to be drawn by the City Electric Street Railway Company, the McCarthy-Joyce Company, and the Press Printing Company, or either of them, between the 12th day of February, 1892, and January 10, 1893, when he went out of office, in excess of a total indebtedness of $50,000 on the part of either of said corporations; the liability on account of these three corporations being for such increase in excess only.

And the court finds and adjudges that under the evidence a decree should be entered in favor of the estates of C. M. Taylor and William Farrell, and defendant P. K. Roots, and that the bill should be dismissed as to them.

In so far as the findings of fact and law submitted by the special master heretofore appointed in this case are in conflict with this decision, they are hereby overruled, and the exceptions to such findings are sustained, and a new order of reference will now be made for the ascertainment of the amount of losses and liabilities in conformity with this decision, and a decree will be entered in conformity with this decision covering all the matters and things aforesaid.