**ATHERTON et al. v. ANDERSON.**
No. 7298.

Circuit Court of Appeals, Sixth Circuit.
Nov. 16, 1938.

SIMONS, Circuit Judge, dissenting.

W. W. Crawford and John C. Doolan, both of Louisville, Ky. (Newton D. Baker and Howard F. Burns, both of Cleveland, Ohio, and Wm. W. Crawford, Henry E. McElwain, John C. Doolan, T. Kennedy Helm, Allen P. Dodd, A. C. Van Winkle, Graddy Cary, Herman H. Nettelroth, J. Wheeler Campbell, Huston Quin, Herman G. Handmaker, Thomas A. Barker, David R. Castleman, Henry J. Tilford, Charles G. Middleton, and Churchill Humphrey, all of Louisville, Ky., on the brief), for appellants.

John G. Heyburn, of Louisville, Ky., and E. B. Stroud, Jr., and E. P. Locke, both of Dallas, Tex. (Eugene P. Locke, E. B. Stroud, Jr., and Maurice E. Purnell, all of Dallas, Tex., Arthur Peter and John G. Heyburn, both of Louisville, Ky., Locke, Locke, Stroud & Randolph, of Dallas, Tex., and Peter, Heyburn, Marshall & Wyatt, of Louisville, Ky., on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Our first opinion is found in 6 Cir., 86 F.2d 518. The Supreme Court remanded the cause for a determination of the question whether the common law liability of appellants for negligence would support the decree of the District Court. 302 U.S. 643, 58 S.Ct. 53, 82 L.Ed. 500.

The controversy is reduced to: (1) Loans to and overdrafts by Kentucky Wagon Manufacturing Company; (2) loans to Wakefield & Company; (3) loans to Murray Rubber Company; and (4) loans collateraled by Banco-Kentucky stock.

### Kentucky Wagon Manufacturing Company

The District Court found that the loss to the Bank between March 30, 1926, and November 16, 1930, resulting from money supplied by it to Kentucky Wagon Manufacturing Company, herein called Wagon Company, was $991,283.57. This finding is undisputed.

The Master found in substance that the expenditure of this large sum was improvident. He said: "The amounts expended got to be enormous in comparison with the debts to be saved." He found that between August 8, 1924, and November 16, 1930, the Bank advanced $1,215,419.27 in excess of what it had received from the operation of the property. It cannot be doubted that these expenditures were improvident and wasteful. Appellants, directors of the Bank, during the period involved, do not contend otherwise. The District Court found that they made no effort to terminate these expenditures and this is true. Their defense was that they did not know that these overdrafts were being allowed; that Brown, the President of the Bank, Jones, the Cashier, and certain other executive officers concealed this information from them.

We held that the overdrafts were so concealed. This was true in the sense that the directors trusted in the integrity of these men and were deceived, but this does not necessarily foreclose the question whether appellants were chargeable with common law negligence.

In Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662: the court said, at page 152, 11 S.Ct. at page 931, "In any view the degree of care to which these defendants were bound is that which ordinarily prudent and diligent men would exercise under similar circumstances, and in determining that the restrictions of the statute and the usages of business should be taken into account. What may be negligence in one case may not be want of ordinary care in another, and the question of negligence is therefore ultimately a question of fact, to be determined under all the circumstances." This statement of the law was approved in Bowerman v. Hamner, 250 U.S. 504, 39 S.Ct. 549, 63 L.Ed. 1113.

It is unnecessary to recite the history of the Wagon Company prior to 1924. This is set forth in the original opinion. It is enough to say that at that time over $900,000 of the Bank's money loaned to the Wagon Company was endangered. The directors then on the Board knew this and those who became members in 1927 as a result of the unification with the Louisville Trust Company knew that this indebtedness, after large charge-offs for worthlessness, was then at least around $440,000. It was their duty to salvage this money and the care required of them was commensurate with the danger of its loss. After the Bank had acquired ownership of the Wagon Company the directors knew that it was without operating funds and yet these large overdrafts were permitted.

The Wagon Company account was primarily in charge of Brown who authorized

the overdrafts. They were made in the form of checks approved either by Jones or Angermeier, both of whom were on the Board of the Wagon Company, placed there by Brown and controlled by him. These checks in varying amounts were honored, almost daily, from August, 1924, until the Bank closed. The amounts thus advanced averaged about $200,000 yearly and were settled semi-annually by unsecured notes of the Wagon Company just before the due date of the Bank's report to the Comptroller. By this method the Bank advanced $1,210,360.33. The Wagon Company account was discussed and considered by the Board at its weekly meetings and Brown, Jones and Angermeier would report that the Company was making its way or breaking even or making a little money or losing a little and that no new money was being invested.

Under the facts as stated and presently to be stated we do not think that appellants are justified in saying that they were uninformed of what was taking place. Directors of a national bank are not required to maintain a system of espionage over the acts and conduct of its officers. Briggs v. Spaulding, supra, 141 U.S. 132, at page 162, 11 S.Ct. 924, 35 L.Ed. 662. The business of a bank may be entrusted to them upon the assumption that they are honest and faithful but they are not to be regarded as infallible. Warner v. Penoyer, 2 Cir., 91 F. 587, 590, 592, 44 L.R.A. 761. As pointed out in Gibbons v. Anderson, C. C., 80 F. 345, 349, it is not unusual for banks to meet disaster through the malfeasance of trusted officials. This is one of the dangers to be apprehended and guarded against. For this reason the law requires and depositors have a right to expect that directors should retain and maintain a reasonable control and supervision over the affairs of the Bank, especially its larger and more important ones, to the end that they may keep themselves informed of its condition. Briggs v. Spaulding, supra; Bowerman v. Hamner, supra; Gibbons v. Anderson, supra; Warner v. Penoyer, supra; Wheeler v. Aiken County Loan & Savings Bank, C.C., 75 F. 781. In the discharge of this duty the directors are required not only in the observance of their official oath but by common law (Martin v. Webb, 110 U.S. 7, 15, 3 S.Ct. 428, 28 L.Ed. 49) to use ordinary diligence; and by ordinary diligence is meant, that degree of care demanded by the circumstances. They have their own responsibilities which they may not put aside. They must keep in mind that a national bank is not a private corporation in which stockholders alone are interested. It is a quasi governmental agency (Farmers' & Mechanics Nat. Bank v. Dearing, 91 U.S. 29, 23 L.Ed. 196), and one of its principal purposes among others is to hold and safekeep the money of its depositors. We think it may be fairly assumed, that if appellants had maintained any reasonable method of supervision over the Wagon Company account or over the general affairs of the Bank, these large and wasteful overdrafts occurring almost daily over a period of six years and periodically converted into unsecured notes which were in turn periodically renewed, would certainly have been discovered. See Williams v. McKay, 40 N.J.Eq. 189, 53 Am.Rep. 775; and Williams v. McKay, 46 N.J.Eq. 25, 18 A. 824.

But, this inference aside, there are certain undisputed facts which confronted appellants in 1919.

The by-laws of the Bank provided that there should be a Chairman of the Board who should be the principal executive officer of the Bank. Mr. Fenley was Chairman until his resignation in January, 1921. The position was then abolished and its duties combined with those of President Brown. This naturally increased the hazard of one-man control and was a well recognized danger to be guarded against.

In 1919, that the Board might have a clearer insight into the Bank's affairs, it appointed an examining committee consisting of three non-officer directors. A similar committee was appointed for the years 1920, 1921 and 1923. These committees functioned efficiently and made valuable and comprehensive reports but were discontinued in April, 1923, and thereafter no such committee was ever appointed and no representative of the Board ever examined the affairs of the Bank or audited the business. As late as May, 1930, when the directors were confronted with a true picture of the Bank's deplorable condition, they passed a resolution to appoint such committee but it was never appointed.

In 1922, the Board provided an Auditor but he was not a director. Brown employed him and fixed his salary. His duties in a Bank of its size where at least 150 bookkeepers were making daily records were of course important. These duties were "to audit all the records of the Bank, see that the proper records were kept, make annual checks, quarterly checks of all ac-

counts, make reports and checks of General Ledger items, etc." He served as Auditor until January 15, 1930, and from that time as Cashier and Auditor until the close of the Bank. He made an audit of some of the departments monthly and all of them quarterly. He was required to and did report to the Cashier only. The Board never called upon him to report and it does not appear that any director ever saw a report.

[11–13] The discontinuance of the Examining Committee standing alone was negligence. It was the duty of the Board in the management of the affairs of the Bank to cause examinations to be made of its books and papers. Bowerman v. Hamner, supra (250 U.S. 504, at page 513, 39 S.Ct. 549, 63 L.Ed. 1113); Gamble v. Brown, 4 Cir., 29 F.2d 366, 371; Rankin v. Cooper, C.C., 149 F. 1010, 1013. This should have been done that the Board might know, as it was its duty to know, the condition of the Bank and the way and manner in which it was being conducted. It is said that the audits furnished greater protection to the Bank than the reports of the Examining Committee would have furnished. But a system by which the reports of the Auditor, however faithfully assembled, were made to the Cashier alone, was palpably faulty. It was adopted against the recommendation of a national bank examiner and hindered rather than helped the directors in the discharge of their duties. It made the way easy for Brown.

The Bank had a loan committee of eight of its officers. It never reported to the Board over their signatures as to the condition of the loans. A mimeographed copy of the list of loans for each preceding week was submitted to each member of the Board at their weekly meetings. These lists set out the amounts of each individual loan, the name of the borrower and of the endorser, if any, the collateral, if any, and if the note was a renewal, the amount that had been paid, if any, on the pre-existing loan. This was about all. The directors did not know what particular officer or employee of the Bank made up these loan lists, and what is more important, they did not know what should have been easily ascertained, i. e., that Brown was making large loans upon his own initiative.

Laying aside the probable effect of combining the office of Chairman of the Board with that of the President, it is manifest that if the appointment of examining committees, a commonly known safeguard, had not been discontinued, or if the Board had required the loan committee to make comprehensive and intelligent reports, or required the Auditor to report directly to it, the overdrafts and loans to the Wagon Company would have been discovered and no doubt terminated at the outset.

Moreover, Humphrey Robinson & Company, Clearing House Accountants, made a complete audit of the business of the Bank at the close of each year, filed a copy of their report with it and sent a notice thereof to each director. National Bank Examiners made an examination semi-annually and forwarded their reports to the Comptroller of the Treasury, leaving a copy with the Bank. The record is replete with copies of letters from the Comptroller's office from 1919 until the close of the Bank concerning these reports. Some of these letters were addressed directly to the Board, others to the President, and others to various officers of the Bank. It is not practical here to go into detail touching the contents of either the letters or the reports. It is enough to say that the reports exhibited the ruinous condition of the Bank in general and of the Wagon Company account in particular and the Examiner's reports invariably criticized the handling of it and especially the excessive overdrafts. The letters also complained of the unsatisfactory management of the Bank's affairs in many particulars and urged immediate corrective measures. Very few of these letters ever came to the attention of the Board. The probability that communications from the Comptroller were being suppressed does not seem to have occurred to any members of the Board. The reports were brought to the Board meetings and Brown, as the presiding officer, was permitted to read them. Pretending to read them as a whole, he designedly omitted the portions thereof which disclosed the perilous condition of the Bank and particularly of the Wagon Company account, due to the misdoings of himself and his subordinates. He systematically perpetrated this deception throughout the years involved.

Appellants advance their consequent lack of knowledge as a defense. Obviously it is not sufficient. Ignorance under such circumstances is not an excuse. Shea v. Mabry, 1 Lea, Tenn., 319, 342. It was their duty to know the facts. They had the means of knowledge literally before them and they would have known had they exercised the control and supervision over the Bank and its officers which the

law requires. They "cannot * * * shut their eyes to what is going on around them." Martin v. Webb, supra, 110 U.S. at page 15, 3 S.Ct. at page 433. They might have examined these reports for themselves. It was said in Goess v. Ehret, 2 Cir., 85 F.2d 109, that this was the minimum required of a director. In the alternative the Board might reasonably have adopted a common custom and one practiced in this particular Bank prior to Brown's incumbency and in the Louisville Trust Company prior to the unification, of having a committee of their number to examine and report upon such reports. Ordinary prudence demanded something more. They were not required to proceed as if Brown were under suspicion but they had their own duties of oversight and supervision to perform. In Lippitt v. Ashley, 89 Conn. 451, 94 A. 995, it is said [page 1000]: "This duty of supervision is not performed by reposing confidence in such officers, however worthy of confidence they may seem to be. The history of the business, known to every bank director, shows that confidence without supervision has often proved to be a temptation and an opportunity." See also Fletcher v. Eagle, 74 Ark. 585, 86 S.W. 810, 109 Am.St.Rep. 100; Gibbons v. Anderson, supra; Campbell v. Watson, 62 N.J.Eq. 396, 50 A. 120.

Appellants say that it was common procedure at bank directors' meetings generally for the president to read the reports but this defense is not conclusive in character in a case where the custom is a dangerous one.

The Bank made quarterly statements to the Comptroller, attested by three directors, of its condition beginning March 31, 1924, and continuing to its close, and kept copies. It printed and distributed among its customers and friends about two thousand copies of each statement. The statements carried "overdrafts" varying from $3,157.78 on December 31, 1927, to $434,-185.25 on October 10, 1927. Three were more than $200,000 and three for more than $100,000. These abnormal amounts became the subject of comment and criticism by the Comptroller, the Examiners and other banks, and noticeably affected the business. Yet the record discloses that no director except those attesting the statements ever examined one of them and they only formally and perfunctorily.

Contrary to the conclusion of the Master, we think that the losses on the Wagon Company account were due proximately to the failure of appellants, who were directors during the period of its continuance, to maintain proper control and supervision over the affairs of the Bank. We recognize here, as we did in the former opinion where we were dealing with the statutory liability of directors, that there are certain inferences in favor of the Master's findings. But the order of reference reserved full power to review, amend or set aside any of the Master's findings of fact as well as his conclusions of law; and provided that his findings should be advisory only and not in any degree or to any extent binding upon the independent judgment of the court. It follows that the decrees against such appellants for losses upon this account are affirmed except as hereinafter indicated.

It is urged that such finding should not apply to director Crawford because of a different factual situation as to him.

He became a director on June 10, 1927, soon after the unification of the Bank with the Louisville Trust Company, of which he had been a director. While on its Board he served as a member of a committee to consider the matter of affiliation. In the discharge of his duties as such committeeman he had taken steps to ascertain the status of the Wagon Company item, the only one in which he is involved. He knew that the Comptroller had approved a 60% stock dividend by the Bank in aid of the affiliation and had congratulated the President of the Trust Company upon the unification. He knew further that Humphrey Robinson & Company had made a most favorable report of the Bank's condition to the Trust Company.

Such were the circumstances as they appeared to him when he became a member of the Board of the Bank and attended its meeting of June 24, 1927. At this meeting when Brown announced that he had the last Bank Examiner's report, a member, formerly a member of the Board of the Trust Company, moved, according to the custom which had prevailed with the Trust Company, that the report be referred to a committee for report thereon. But Brown stated that while that was the practice of the Trust Company the Bank handled the reports in a different way; that the practice was to read the report; and with that explanation he read it, reading portions thereof incorrectly and omitting material and important portions altogether. He stated, untruthfully, that he was reading all the

criticisms contained in it. The members, including Crawford, accepted it, as read, without comment. No further attention was given it.

On June 30th, the Deputy Comptroller wrote directly to the Board and criticized in several particulars the condition of the Bank as reflected by this report. He referred especially to "unwarranted overdrafts"; and the unsatisfactory condition of the Wagon Company account. The Board never received this letter. After the Bank closed, the Examiner's report was found and it disclosed a disastrous condition. It revealed that the Wagon Company owed the Bank $1,002,930.59, which it described as slow, doubtful and worthless paper; and recommended that $100,000 be charged off. The report further disclosed an overdraft of the Wagon Company, more than six months old, of $229,092.54; that Brown himself was overdrawn $30,993.44 and that the Herald Post Company, owned by him, was overdrawn $74,917.82. It was the duty of the Board to ascertain the contents of this report when it was presented. The slightest effort would have made them available but it blindly entrusted the entire matter to Brown and his subordinates. Brown was in fact directing the directors as to how the report should be handled. See Armstrong v. Chemical Nat. Bank, 6 Cir., 83 F. 556, wherein in a somewhat similar situation the court said [page 570]: "The subordinates in the bank * * * recognized Harper as the manager, not only of the bank, but of the directors. * * *"

Upon such a record directors are not permitted to excuse themselves by saying that they were deceived. See Auten v. U. S. Nat. Bank, 174 U.S. 125, 147, 19 S.Ct. 628, 43 L.Ed. 920; Lowndes v. City Nat. Bank, 82 Conn. 8, 72 A. 150, 22 L.R.A., N.S., 408.

But Crawford does not rest his case solely upon this ground. Because of professional engagements he did not attend the last three weekly board meetings in July and was absent on his vacation in September. But some time soon after the incident of June 24th he became suspicious of Brown and in a board meeting made inquiry of him about the Wagon Company matter. The response was unsatisfactory. On a second similar occasion he again asked Brown about the same matter and for the second time received an unsatisfactory reply. After the meeting he told Brown that he was not getting the information he was entitled to. Brown then made about the same reply he had made in the meeting. Crawford then asked Brown, "What about the Herald Post?" This was Brown's newspaper which was largely indebted to the Bank. Brown replied that this loan was satisfactory to the executive officers, to which Crawford responded that it was not satisfactory to him. Crawford then resigned on December 12th, having served only six months.

The question is, whether he was negligent with reference to the Wagon Company matter during his short service. We think that the weight of the evidence does not show that he was. He was not unmindful of his obligations as a director. The disturbing question with him was whether in the interest of the Bank he should take action which would result either in confirming or dispelling his suspicion, or whether he should resign. It is easy to see that from his standpoint the first alternative might have resulted in greater harm than benefit. We cannot say that his failure to act was due to negligence as distinguished from sound judgment and the bill must be dismissed as to him.

A special defense is made by the Executor of the Estate of Alexander P. Humphrey. Judge Humphrey was a director from February 3, 1919, to January 10, 1928. He attended the board meetings regularly until December 5, 1925, when a personal injury kept him away until September 24, 1926. He attended regularly from the last mentioned date to January 7, 1927. He was then in Florida until February 11. He attended the meetings from February 11 to May 20, 1927, but during this period he was feeble and was accompanied by a servant. He could hear ordinary conversation and without sight in one eye, could read rapidly but never read what could be read to him. On account of his advanced age and physical condition he never attended a board meeting after May 20, 1927, and resigned in January, 1928.

The decree charged his estate with the advancements made to the Wagon Company from March 30, 1926, to January 9, 1928, the day before his resignation. It is urged that the estate should not in any event be held liable for such advancements made during the periods of his prolonged absences from the board meetings.

■■■■■ The Master found that Judge Humphrey was not negligent in staying away from the Board meetings between May 20, 1927, the time of his physical collapse, and January 9, 1928, when he resigned. We concur in this finding. He is not chargeable with neglect of duty which he was physically unable to perform. Nor is he to be held because he did not resign earlier (Briggs v. Spaulding, supra—141 U.S. 132, at page 155, 11 S.Ct. .924, 35 L. Ed. 662), but there is no escape from the conclusion that during his long and active service upon the Board a faulty system of administration and supervision was created and maintained which Brown and his underlings were permitted to take advantage of. (We need not repeat a statement of the facts.) Negligence in this regard combined and concurring with the continuance of these practices by those remaining upon the Board after May 20, 1927, was .the proximate cause of the Wagon Company losses.

It is unpleasant to dwell upon the misfortunes of upright, honest men. It is enough to say that we find no sound reason to- exclude the Humphrey estate from the common law liability against appellants for the advancements made to the Wagon Company.

### Wakefield and Company Loans

The question here is, whether appellants, Duncan, Durham, Clark, Callahan, Carroll, Vogt, Hickman and Liberty National Bank and Trust Company, Administrator of the Estate of Brainerd Lemon, are liable on common law principles for the decrees against them for a violation of R. S. Sec. 5200, Title 12, Sec. 84, U.S.C., 12 U. S.C.A. § 84, prohibiting excessive loans.

Certain facts found by the Master were quoted and accepted by the District Court and requoted in our opinion. We set down certain additional facts.

Callahan, Carroll, Duncan and Durham were directors from 1919 to the close of the Bank. Clark was a director from 1922 to its close; Hickman from 1923 to July 25, 1930; and Lemon from 1909 to July 23, 1929. In his report of November 7, 1925, Examiner Wood pointed out that loans standing in the names of Latta and Greer were for the accommodation of Wakefield and Company and when combined with the Wakefield loan exceeded the limit by more than $287,000.

■■■■ In his report of April 23, 1927, Examiner Sailor disclosed that notes to Greer,

Harris and Meagher each for $300,000 were accommodation loans for Wakefield and Company and when combined with the Wakefield loan were $300,000 in excess of the limit. This was the same report presented to the Board on June 24, 1927. Through the pretense of faithfully reading these and other official reports, Brown, in collusion with certain of his subordinates, concealed the excessiveness of these loans. There was scarcely a time between November, 1924, and the close of the Bank, when the Wakefield and Company indebtedness standing either in the name of the Company or its owner, Mrs. Latta, or Greer, Harris, Schweitzer and Meagher, her employees, did not largely exceed the loan limit. These monthly aggregate loan balances varied from $609,012 to $1,540,-000. Brown permitted these loans to be made and reborrowed large amounts thereof from Wakefield and Company for his personal use. Appellants did not know these astounding facts. Aside from whether anything had occurred to awaken suspicion, we think they should and would have known them if they had given that attention to the Bank's affairs required by ordinary care (Briggs v. Spaulding, supra,. page 148, 11 S.Ct. 924) or the care commensurate with their duties as directors. Any of the common and ordinary methods of control and supervision heretofore pointed out would have been sufficient. They were not justified in disregarding all precautions and relying wholly upon the integrity of Brown and those dominated by him.

On June 30, 1927, a Deputy Comptroller sent the letter hereinbefore referred to addressed directly to the Board in which he referred to the Sailor report and said: "It is evident from the statement of the examiner on page 5 that the loans of the individuals included in this line were for the accommodation of Wakefield & Company, and should, therefore, be included with the direct liability, and the line reduced to the 10% limit."

Jones .answered this letter on July 23rd but made no mention of the Wakefield matter. On September 7th the Deputy Comptroller wrote a second letter to the Board in which he stated: "Referring to the report of the last examination of your bank and of previous correspondence in regard thereto, *please advise over the signatures of the available directors whether the excessive loans have been reduced to the legal limit.*" (Italics ours.)

The Board met on September 16th, but these letters were designedly withheld. Following this meeting and on the same date the Cashier prepared a letter addressed to the Deputy Comptroller, which stated:

"We beg to acknowledge receipt of your office letter under date of September 7, 1927, with reference to your last examination of this bank and to previous correspondence in regard thereto.

"Wish to advise that loans listed by your examiner as excessive of the legal limit have been reduced as follows,

| | |
|---|---:|
| Kentucky Jockey Club | $530,200.00 |
| Reduced by payment to | 469,200.00 |
| Consolidated Realty Company | 478,400.00 |
| C. C. Hieatt | 413,610.00 |
| H. J. Scheirich, C. C. & G. Y. Hieatt | 30,100.83 |
| | $922,110.83 |

Have been reduced to:

| | |
|---|---:|
| Consolidated Realty Company | 435,200.00 |
| C. C. Hieatt | 59,000.00 |
| H. J. Scheirich | 100,000.00 |
| | $594,200.00 |

"The loan of $100,000.00 to H. J. Scheirich is secured by certificate of deposit of this bank for full amount.

"Loans listed under the caption of loans especially mentioned have been reduced $966,797.64 as per itemized list attached.

"Very respectfully yours......"

Brown and Jones signed this letter as President and Cashier respectively, and Jones carried it to each of the twelve directors privately and procured their signatures. Eight of these men were non-officer directors. They or their representatives are appellants here. These non-officer directors knew that no letters of the Comptroller had been presented to the Board; that the letter which they were requested to sign had not been presented at the Board meeting just adjourned which had been attended by twenty-three directors; that it was important enough to require the signature of the available directors. A moment's consideration would have convinced them that it was a deception; that it purported to be a reply to letters which they had never seen and contained important statement of facts which they did not know to be true. Signing the Jones letter under these circumstances exhibited a lack of ordinary care. It was

contrary to all prudent business methods. The circumstances would have excited the attention of cautious directors charged with heavy responsibilities—they would have demanded the letters to which they were replying, the fraud would have been uncovered, the facts disclosed and corrective measures would have been applied. The Comptroller had the right to demand the truth; it was their duty to know it (indeed they are deemed in law to have known it, Wood v. Carpenter, 101 U.S. 135, 141, 25 L.Ed. 807) and communicate it, and they were not justified in placing unsuspicious confidence in Jones, who was not their agent but that of the Bank, or in his statement that the reply was about a routine matter only. See cases above cited. We think that the decree against these appellants is supported by proof of common law negligence and is therefore affirmed.

The discussion of the Wakefield & Company loans in the original opinion was from the standpoint of whether appellants had violated the statute, Sec. 5239, R.S., Tit. 12, Sec. 93, U.S.C., 12 U.S.C.A. § 93. We disagreed with the court's conclusion that the directors had deliberately refrained from investigating that which it was their duty to investigate and that the violation of the statute was in effect intentional as construed in Corsicana Nat. Bank v. Johnson, 251 U.S. 68, 71, 40 S.Ct. 82, 84, 64 L.Ed. 141; but such holding did not foreclose consideration of their common law liability for negligence in dealing with the same loans.

### Murray Rubber Company Loans

These loans were made in various amounts between May 12, 1928, and the closing of the Bank, and aggregated $421,249.87. The court fixed the loss at $409,630.04 and entered a decree against each director for the amount of each note approved by him which represented a portion of the total loss, these decrees however to be credited by proportional amounts received by appellee from the assets of the Murray Rubber Company being liquidated in receivership proceedings against that company. These decrees were based upon a finding that the notes constituted excessive loans and were in violation of R.S. Sec. 5200, Tit. 12, Sec. 84 U.S.C., 12 U.S. C.A. § 84. We reversed that holding. Our question here is whether the decrees are supported by common law negligence of appellants, non-officer directors. The

9

Master failed to find that they were negligent and the District Court did not pass upon the question. When the lists of loans, including the notes here involved, were presented at the weekly board meetings these loans were approved by the directors present. The same general administrative system of the Bank as hereinbefore set out continued from May, 1928, until its close. There was no examining committee; the auditor was not required to report to the Board; the loan committee was not required to submit the list of loans over their signature; the directors themselves did not read the reports of the Examiners or Humphrey Robinson & Company or cause them to be examined and reported upon by a committee, according to the original practice of the Bank, and of the Trust Company, prior to the merger.

■ On May 12, 1928, the Rubber Company owed the Bank $606,346.72. $330,000 of this amount was represented by first mortgage bonds and the remainder by notes. Appellants knew that the Rubber Company was then in a serious financial condition. It had on September 1, 1925, contracted its entire output of tires and other rubber products to Sears, Roebuck & Company. On April 1, 1926, this contract was cancelled and the Rubber Company had no sales outlet. · The Company brought suit against Sears, Roebuck & Company and on March 10, 1927, received $375,000 in settlement but the Bank, then a large creditor, received no portion of this money,—it went to the payment of other creditors. The Company lost $254,276.68 in 1926 and $225,006.86 in 1927. The losses continued until in April, 1928, when, the situation becoming alarming, the Company and those interested made an agreement with the Bank and the Third National Bank of Scranton, Penna., another large creditor. It is unnecessary to develop the details of this arrangement. It is sufficient to say that the Bank agreed upon certain considerations set out therein to lend the Company $250,000 on open account with an additional $150,000 to be secured by the assignment of accounts receivable. The Scranton Bank agreed to lend it $150,000 on open account and an additional $150,000 on good security. These commitments included all outstanding loans and were made after many conferences.

We cannot say that this arrangement was inconsiderate. If it was, it was inconsiderate upon the part of the Scranton bank also. While the Company was losing money it had a net worth of $1,345,000 and was a going concern. It was the duty of the Bank to determine what course to pursue under the circumstances. To protect itself it decided to advance the additional money and we cannot say that it acted otherwise than upon sound judgment. See our former opinion, 6 Cir., 86 F.2d 518, 525.

■ Between May 12, 1928, and November 3, 1928, appellants, non-officer directors, approved loans to the Company amounting to $25,587. We think that these loans might be justified under the circumstances then existing and that any decree for the amount thereof, based upon negligence, is unwarranted and the amount of the decree against these appellants on the Murray Rubber Company loans is reduced accordingly. However, on November 23, 1928, President Brown submitted to the Board the report of Examiner Wood as of October · 13th. This report disclosed that the Company was in a "deplorable condition" and that during the first half of 1928 it sustained an · operating loss of $227,019.00 and that $130,325 of its receivables were from six months to more than one year old. The report continued: "The statement presents about as gloomy a picture as can be imagined. One more year with operating results even approximating results for the first half of 1928 would render it impossible for the bank creditors of the company to continue to carry the unsecured obligations of the company at book value. Indeed, it is a very serious question now whether the loan and bonds of the company should be carried at par. * · * * "

The next report of Examiner Wood as of May 25, 1929, presented to the directors' meeting on August 23rd, was, if possible, more alarming. It revealed that the Company's statement of April 30th showed an indebtedness of $2,049,884 against a net worth of $862,582; that its debts were two and one-half times greater than its net worth and that it had a net operating loss for April of $29,883. Pretending to read these reports, Brown concealed their important features. The reason· for the concealment, whether at the instance of Angermeier (the Vice-President of the Company and also allied with Brown in the mismanagement of the Bank), or otherwise, does not appear.

It was the duty of the directors to acquaint themselves with these reports. They could readily have done so through any of the ordinary modes of procedure hereinbefore pointed out. The conditions disclosed would naturally have led to further inquiry (Curtis v. Connly, 257 U.S. 260, 264, 42 S.Ct. 100, 66 L.Ed. 222) and revealed the severely critical letters of the Comptroller addressed directly to the Board concerning the Rubber Company account as well as the condition of the Bank in general. Any reasonable "follow up" would have disclosed that the Comptroller's letters were withheld from the Board by Brown and Jones; that many of them remained unanswered; that others were replied to only after the Comptroller had repeatedly called attention to the delay; and that many of the answers dealt in excuses and subterfuges.

For a case wherein a director misread to his fellow directors the discount register of the bank and failed to read out the large indebtednesses due by him to the bank, see Boyd v. Applewhite, 121 Miss. 879, 84 So. 16.

We think under the circumstances that ordinary care would have forbidden these loans, except as indicated, or would have salvaged at least some of them, and that the decree thereon, except as indicated, is supported by proof of common law negligence. It is urged that the Comptroller should have taken corrective measures but appellants cannot thus justify their own ignorance of conditions or shift their responsibility.

Loans on Shares of the Banco Kentucky Company

The plan for the organization of the Banco Kentucky Company (herein called Banco) is set out in the original opinion. For present purposes the history of the sale of its stock is sufficiently detailed therein.

The District Court entered a decree against certain directors in the sum of $1,636,613.14, upon the ground that they had knowingly assented to making loans secured in whole or in part by collateral of Banco stock in violation of Sec. 83, Tit. 12 U.S.C., 12 U.S.C.A. § 83. We reversed that portion of the decree.

Our question of course is, whether it is supported by evidence of common law negligence. The basis for the claim of negligence is that these loans involved too great concentration of Banco stock in the Bank; that appellants should have anticipated the necessity of selling at least some substantial part of the collateral to satisfy the loans and that such sales would inevitably depress or destroy the value of the remaining collateral as security as well as all other outstanding Banco stock. There were 468 separate loans secured by Banco stock. The law will presume that the makers of these notes were solvent when they were made.

Appellee questioned the solvency of only 42 of those whose loans aggregated $729,301.31. After hearing the evidence the Master found that it failed to establish that 16 of these borrowers to whom the Bank had loaned $502,178.72 in the aggregate were insolvent when the loans were made, leaving out of consideration the worth of the collateral Banco stock; but he found that 26 borrowers whose loans totalled $227,122.58 collateraled by 9084 shares of stock, were insolvent when their notes were made. Appellee excepted to these findings. The court did not expressly overrule these exceptions but we think that the effect of the three separate opinions of the court, its finding of fact and the decree was to confirm this feature of the report.

The standard of duty required of directors in approving collateral security for the payment of a bank loan is that of due care under the circumstances. Much depends upon the financial worth and moral character of the borrower. He might unquestionably be solvent and if so there is no absolute duty to take collateral because there is no necessity for it (opinion of Circuit Judge Denison sitting by designation in the early stages of the case). Upon the findings of the Master which we see no reason to disregard, our question seems to be narrowed to whether the concentration of the 9084 shares of Banco stock as collateral on $227,122.58 of debts was negligent. We do not find as a matter of law that it was. The directors might reasonably have anticipated the necessity of selling some of these shares to satisfy debts which they secured but it does not follow that they might have apprehended that such sales would weaken all other Banco collateral. These 26 loans were made on October 1, 1929. The market price of Banco stock was then around $25 per share and was never lower than $25 until October 29th, when it closed at $23¼.

The Master reported: "It continued above 25 until November 16, 1929. On

March 24, 1930, it sold on the market at 24. It went up to 25 by April 1st, and continued a little bit in excess of 23 until June 14th. On August 6, 1930, it sold at 20, and it continued between that and the middle of September at approximately 17. It sold at 16 on September 24, 1930, and at 16½ on October 9, 1930. This is a much better record than many other stocks during the same period."

We think the proposition that the Bank lost because the directors feared to sell Banco collateral lest such sales would disparage the value of its remaining Banco collateral or of outstanding Banco stock, which at that time amounted to about 2,-000,000 shares, is highly speculative. It has no satisfactory probative force to sustain it! Our conclusion is that the decree against appellants dealing with loans on Banco shares is not supported by satisfactory evidence of negligence of excessive concentration of Banco collateral.

Appellant C. C. Hieatt is made liable by our holding touching the Kentucky Wagon Manufacturing Company and Murray Rubber Company matters unless he is protected by his discharge in bankruptcy.

■■■ This bill was filed on March 30, 1931. Hieatt jointly with other directors answered the bill and joined in the defense. On June 23, 1932, he filed a petition in bankruptcy and was adjudged bankrupt on the following day. He inserted in his schedule of unsecured liabilities the identical claims prosecuted against him here. He was granted a discharge on May 24, 1934. On July 27, 1934, the District Court, in its original opinion, held Hieatt liable as a director. His position then was, and now is, that the claims set up against him in the bill were discharged in bankruptcy because they were provable under Sec. 63 (a) (4) of the Bankruptcy Act, 11 U.S. C.A. § 103 (a) (4). The sole question is, whether Hieatt's liability as a director was "founded * * * upon a contract express or implied; * * *"

We need not enter into a discussion of the interesting question whether the relationship between a national bank and its director is contractual or otherwise. One of the grounds upon which the bill sought relief against Hieatt in common with other directors was that they "failed to exercise ordinary care, prudence and diligence in the management, conduct and direction of the affairs of the bank. * * *" This did not aver a breach of "a contract express or implied." It was an allegation of negligence at common law. But, upon the assumption that the claims against Hieatt were "founded * * *; upon a contract, express or implied * * *" we think they were not provable in his bankruptcy proceedings because they were not fixed liabilities as evidenced by a judgment absolutely owing at the time of the filing of the petition. See In re Roth & Appel, 2 Cir., 181 F. 667, 673, 674, 31 L. R.A.,N.S., 270, and cases cited; Haynes Stellite Co. v. Chesterfield, 6 Cir., 97 F. 2d 985.

■■■ A special defense is made for certain directors who were directors of the Louisville Trust Company and who became members of the Board in June, 1927, as a result of the unification of the two institutions. They say that the merger itself was induced by the misrepresentations of Brown and other executive officers of the Bank of the actual condition of both the Wagon Company and the Murray Rubber Company accounts; that the overdrafts of the Wagon Company were not only concealed from them in common with other directors but that they were never advised that the Bank owned $330,000 of the bonds of the Rubber Company. But as heretofore pointed out, this character of defense is not available upon the issue of whether during the period of their directorship they were chargeable with negligence at common law.

■■■ It is urged that the substantial averments of the bill were that appellants had violated the National Banking Act (Title 12 U.S.C. § 21 et seq., 12 U.S.C.A. § 21 et seq.), first, by participating in or assenting to the continued operation of the Wagon Company business as a speculative venture; second, by approving the Wagon Company and the Murray Company loans in excess of the allowable limit under Sec. 84, Tit. 12, 12 U.S.C.A. § 84; and third, by approving loans on Banco shares prohibited by Sec. 83, Tit. 12 U.S.C., 12 U.S. C.A. § 83.

We held in the original opinion that the operation of the Wagon Company business as a speculative venture was ultra vires but that no liability was imposed upon appellants for a violation of the statute because they did not knowingly permit such violation or participate in or assent to the advancements to the Wagon Company through the overdrafts; and did not knowingly permit or participate in or assent to

the Wakefield and Company loans; that the Murray Company loans were not excessive, and that the loans on Banco shares did not violate Sec. 83 of the Act.

It is said that if there was no violation of the statute at all or if there was and yet appellants did not knowingly permit it or participate in it, or assent to it, as provided by Sec. 93, Tit. 12 U.S.C., 12 U.S.C.A. § 93, they incurred no liability whatever because the liability imposed by the statute was exclusive. We do not so understand the law.

Section 93, Title 12 U.S.C., 12 U.S. C.A. § 93, provided a rule by which liability of directors for the violation of certain provisions of the Banking Act was to be determined. This rule was exclusive of all other rules (see Yates v. Jones Nat. Bank, 206 U.S. 158, 27 S.Ct. 638, 51 L.Ed. 1002; Bowerman v. Hamner, 250 U.S. 504, 511, 39 S.Ct. 549, 63 L.Ed. 1113; Ringeon v. Albinson, D.C., 35 F.2d 753), but it does not modify or change the common law defining the duties of bank directors or the judicial methods by which the performance or non-performance of such duties may be determined.

The cause is remanded to the District Court with directions to enter a decree consistent herewith.

SIMONS, Circuit Judge (dissenting).

I am unable to concur in the majority opinion sustaining liability imposed by the decree upon the appellants, exclusive of Crawford, by reason of losses incurred by the bank in overdrafts permitted the Kentucky Wagon Works and in loans to Wakefield & Company. The negligence issues were decided by the master, who saw and heard the witnesses, against the receiver, and exceptions to the master's findings in respect to liability other than statutory were overruled by the court. In this situation we ought not to set aside the master's findings except for clear mistake, and I am not persuaded that such mistake was made.

The test of negligent conduct and its causal relation to injury that follows, is, as has often been said, the existence of a reasonable apprehension that injurious results will follow. The non-officer directors of the bank against whom liability was decreed had organized the officer personnel of the bank with such meticulous care that one or more officers or groups of officers would always check the acts of others;

they had required periodical reports from each group; they had a competent auditor and had employed reputable independent auditors; they had created a loan committee of eight Vice Presidents and lending officers, of whom four were directors while the others were required to attend Board meetings. This committee reported weekly and in writing in the presence of the President and Cashier. Any inaccuracy or falsity in the President's reports and representations to the Board would be known to the officer directors on the Board. It was not reasonably to have been anticipated that so far-flung a conspiracy of wrong doing could be formed among so many officials and officer directors and be successfully carried out to deceive other directors as to the size and nature of loans and the contents of reports of bank examiners and auditors.

The fraudulent conspiracy with which appellants were surrounded is fully set forth in the master's report, quoted verbatim in one of the opinions of the District Judge, and in the previous opinion of this court. The record is silent as to circumstances which should have put the appellants upon their guard as to the integrity of the President, the cashier, or other executive officers. The confidence reposed in such officers by the directors seemed warranted. Under such circumstances there is highest authority justifying their faith in such representations as were made. Bates v. Dresser, 251 U.S. 524, 40 S.Ct. 247, 64 L.Ed. 388, cited in our former opinion.

There are, so far as I am aware, no standardized or generally accepted precautions which bank directors are required to take to secure the bank against misconduct by its officers. The reasonableness of the safeguards employed and their appropriateness to insure the safety intended to be preserved, must be adjudged in each particular case, but the general rule is that "in the absence of circumstances calculated to put directors of a bank upon inquiry, they are ordinarily entitled to rely upon statements made to them by competent persons who are in immediate charge of the bank's business." 7 Am.Jur. § 306, and authorities there cited. Since the question before us is one of common law liability now to be adjudged under the law of the state where the action is brought, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, it is important to note that the law of Kentucky is

as just stated. Savings Bank of Louisville's Assignee v. Caperton, 87 Ky. 306, 8 S.W. 885, 12 Am.St.Rep. 488.